UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                      ) | CRIMINAL NO. 04-10099-GAO |
| ) | |
| RYAN CARTER              ) | |

DEFENDANT'S PRELIMINARY MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS FRUITS OF ILLEGAL ARREST

Defendant Ryan Carter respectfully submits this memorandum in support of his motion to suppress the fruits of his illegal arrest on March 3, 2004.

Since defendant was arrested without a warrant, the government has the burden of showing that the challenged police conduct was lawful. United States v. Cruz Jimenez, 894 F.2d 1, 6 (1st Cir. 1990). Defendant reserves the right to amend or supplement this memorandum in response to the government's reply and to the extent that additional discovery and investigation make necessary.

PRELIMINARY STATEMENT OF FACTS[1]

A. A Car Stop in Dorchester

On March 2, 2004, shortly after 8:00 p.m., Boston Police stopped a speeding SUV in Dorchester, Massachusetts. One of the

---

[1] This preliminary summary includes some police contentions taken from police reports and affidavits. Defendant reserves the right to amend this statement, and to correct police statements, as the evidence from an evidentiary hearing dictates.

two occupants, Marlon Straw, ran from the SUV and was stopped by police. The second man, Robert Hylton, said there was "weed" in a crate in the cargo area of the vehicle. The crate was subsequently opened and was "found to contain a large quantity of marijuana." DEA-6 of Agent George MacLaughlin, March 5, 2004 (hereafter "DEA-6") at 1.

Affixed to the crate was a pre-printed address label identifying GM Import Exports Corp. of California, www.gmimportexport.com, as the cargo company, and Doreen Grant of 82 Fairmont Avenue, Hyde Park as the recipient. Also affixed to the crate was a Forward Air, Inc. shipping label with the airbill number 18276790.[2]

B. Tracing the Shipment

Boston Police Detective Robert Fratalia "believe[d] that three additional wooden crates had been shipped along with the crate that they had seized in Dorchester." DEA-6 at ¶ 2. Using the Forward Air airbill number, he traced the pick-up point of the seized crate to Airport Express, Inc. in Revere, MA. As set out in the DEA-6:

> ...[D]etective Fratalia had tracked the other three
> crates, via the Internet, to the Forward Air, Inc in
> Chelsea, Ma. Further investigation by Det. Fratalia
> showed that the crates were then transferred to the
> Airport Express warehouse at 250 Lee Burbank Highway,
> Revere, Ma. The crates were addressed to James O'Malley

---

[2]The government has not produced to the defense copies of the labels, saying that Boston Police may no longer have them.

>      12 Brookview Street, Dorchester, MA., telephone number
>      617-304-5942, and had been sent by Robert GAYNOR of
>      8126 W. Imperial Hwy, Lynwood, CA. via GM Import Export
>      of 315 Redondo Beach Blvd. Gardena, CA.

DEA-6 at ¶ 3.  Thus, Det. Fratalia had identified the shipping path, specifically that three crates from a named sender (Robert Gaynor) to a named customer (James O'Malley) were transported from California "via GM Import Export" to the receiving Airport Express warehouse in Massachusetts, for pickup.  He also knew that the single crate seized in Dorchester had traveled the same shipping path, but had been sent in a "different batch[ ]" by a different person (Charles Augment) to a different recipient (Doreen Grant) at a different address.

   As is also apparent, Det. Fratalia had learned the respective roles of the several shipping companies.  Two, GM Import Exports, Inc. of California and Airport Express, Inc. provided drop-off and pick-up services for interstate customers.  These companies, called freight forwarders in the trade, used Forward Air, Inc. as the actual freight carrier.  Forward Air, Inc., as its internet site states, "receives air freight from freight forwarders ... at 80 terminals located on or near airports in the United States and Canada.  Shipments received at each terminal facility are consolidated and transported by truck through the Company's network to the terminal nearest the freight's ultimate destination."  Forward Air – About Us: <http://www.forwardair.com/aboutUs/faaboutus.htm.>, attached as

Exhibit A.  To track its shipments, Forward Air assigns an airbill number, identified in its website as "Forward Air Airbill # __, as its internal tracking device, ensuring that it can follow shipments that have been consolidated for efficient movement through its network.  Id.

For example, if an individual wanted to send a crate from Boston to Los Angeles, she could go to Airport Express in Revere. At Airport Express she would fill out a form giving her name and the name of the individual to whom she wanted to send the crate. Airport Express would identify an air cargo company in Los Angeles, where the person in Los Angeles could pick up the crate. Airport Express would contract with a freight carrier, like Forward Air, to actually transport the crate from Boston to Los Angeles.  Should a second individual come to Airport Express wanting to send freight to Los Angeles, Airport Express might group all the crates destined for Los Angeles and send the crates as a consolidated shipment through Forward Air.  For its purposes, Forward Air would generate an airfreight waybill assigning one tracking number to all of the crates in the consolidated shipment, and the airfreight waybill would list the shipper as the cargo company Airport Express and the consignee as the cargo company GM Import Exports.  Each crate in the consolidated shipment would have a distinct address label naming the intended individual recipient. Once the consolidated shipment

would arrive in Los Angeles, the individual crates would be available for pickup.

Thus, the "airbill number" and the "number of pieces" reflect the consolidation by the freight carrier, done for its own shipping convenience. By using Forward Air's airbill number through its website, Det. Fratalia was able to locate the crates.

Thus, as Det. Fratalia developed the shipping information from the internet, he knew the following: the seized crate had been shipped with three other crates, "via GM Import Export", all consolidated under one airbill by the freight carrier, Forward Air. He also knew that the names of the sender and recipient for the three crates differed from those of the crate seized in Dorchester.

C. Officers Arrive at Airport Express Warehouse

At 7:45 a.m. on March 3, 2004, Boston Police Department officers Fratalia and Ball arrived at Airport Express, the freight receiving company in Revere, MA. See Affidavit of Task Force Agent George J. MacLaughlin (hereafter "MacLaughlin Aff."), at ¶ 5, attached as Exhibit B. The officers were shown the three crates. Id. at ¶ 5. Affixed to the crates was the name of the recipient James O'Malley,[3] id. (not Doreen Grant, as appeared on the Dorchester crate).

The officers did not bring a drug dog with them when they

---

[3] A copy of the label is attached as Exhibit C.

arrived at Airport Express (notwithstanding having used a drug dog in connection with the Dorchester crate). The officers "waited to see who, if anyone, would come claim the crates." MacLaughlin Aff. at ¶ 5.

D.  <u>Defendant's Arrest</u>

According to the DEA-6, "a black male" arrived to pick up the three crates and began to load them onto his truck. Det. Fratalia approached the unknown man, identified himself as a police officer, and took the man "into custody ... [and] placed [him] in handcuffs." DEA-6 at 3.

At some point, agents called for a K-9 unit to respond to the scene. The DEA-6 report states:

> While officers and agents waited for K-9 units from the Massachusetts State Police to arrive, BPD detective Robert Fratalia and TFA Monteiro entered the OGV. During this time, TFA Monteiro asked Carter if TFA could inspect Carter's two cellular telephones, which were taken from Carter when he was detained. Carter denied such request. TFA Monteiro informed Carter that any incoming telephone calls that were displayed on the exterior display of the telephones were in plain view and TFA Monteiro, in essence, was allowed to view such numbers, Carter said that he understood. Note: Prior to speaking with Carter relative to the telephones, S/A Ball showed TFA Monteiro the recent calls display of one of the cellular telephones. The telephone's phone book remained untouched. The recent call list showed one call to California and one call to "Pepsi". The name "Pepsi" is the street name of a person who is known to the police as Dale Muir, the target of this investigation.

DEA-6, March 5, 2004 at ¶ 6.

Later, "[a] narcotics dog was brought to the scene."

MacLaughlin Aff. at ¶ 5. The dog allegedly "alerted to the presence of narcotics inside all three crates." Id.

Officers sought a search warrant for the crates. The supporting affidavit asserted that the crates had been shipped "from the same customer" as the crate seized the prior evening in Dorchester and that the four crates were sent in two different batches "from the same customer account number." MacLaughlin Aff. at ¶ 4, n.1. In fact, the senders were different (McNally, not Gaynor) and the "customer account number" was the Forward Air Airbill number, not the customer account number. The supporting affidavit further alleged that "[a] narcotics dog was brought to the scene" [which] alerted to the presence of narcotics ...." MacLaughlin Aff. at ¶ 5. The dog was not identified in the affidavit. The government now contends, based upon discovery post-indictment, that <u>two</u> dogs were brought to the scene and that <u>both</u> alerted.

ARGUMENT

I. <u>THERE WAS NO PROBABLE CAUSE TO ARREST DEFENDANT</u>

An arrest without a warrant must be supported by probable cause. <u>United States v. Watson</u>, 423 U.S. 411, 417 (1976). Probable cause requires the government to show "that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense."

United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994).

Defendant was taken "into custody" when he claimed the three crates at Airport Express in Revere. At the time, police suspected a connection between the Dorchester crate seized the previous evening and the three crates claimed by defendant. But, while all four crates bore the name GM Import Exports Corp., the three crates were shipped for a different person, were addressed to a different consignee, and were picked up at different times by different persons (defendant and not the two men arrested the previous evening). The fact that all four crates were consolidated into a common shipment by the freight carrier did not assure that the remaining three contained contraband.

Thus, as police approached the unknown "black male" claiming the three crates on the morning of March 3, they were pursuing a hunch that the crates might contain marijuana. Relying on the hunch, they arrested and cuffed the man, who at the time was standing in a legitimate business during business hours. They seized his cell phone, accessed its memory and found the name of a target of their investigation.

"In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person ... or other effects .... Nor may the police seek to verify their suspicions by means that approach the

conditions of an arrest." Florida v. Royer, 460 U.S. 491, 499 (1983). Here, the conditions were arrest.

In United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998), a canine alerted to the presence of drugs in four checked suitcases at an airport. The suitcases bore tags with the names Miguel Morales and Jesus Lebron. Customs agents obtained the airline's computer record of reservations, which showed that the men had checked two bags each and which also indicated that two other persons, Carlos Acosta and Noel Travieso, were "connected with the reservations" of Morales and Lebron. Customs inspectors approached Acosta, handcuffed him and removed him from the departure line. At the suppression hearing, the government conceded that there was no probable cause to arrest Acosta. The First Circuit ruled that the manner of his detention, where he was cuffed and detained, amounted to an arrest, unsupported by probable cause. Id. at 21.

In Acosta, the government conceded that the airline reservations printout, which connected defendant to the reservations of persons carrying drugs, was insufficient for probable cause. Here, there was far less -- the happenstance of an airbill number linking crates consolidated for interstate shipment. In Acosta, the government hoped to save its case by contending (unsuccessfully) that it had not arrested the suspect

while it pursued its investigation.  Here, it can harbor no such hope.

Police did more than arrest defendant without probable cause.  They went through his personal effects, including accessing the recent calls display of his cell phone; they opened the digital memory to gain access to the information and learned that one of the recent calls was allegedly made to a target of the investigation.  ("Prior to speaking with Carter relative to the telephones, S/A Ball showed TFA Monteiro the recent calls display of one of the cellular telephones.  The telephone's phone book remained untouched. The recent call list showed one call to California and one call to "Pepsi".  The name "Pepsi" is the street name of a person who is known to the police as Dale Muir, the target of this investigation."  DEA-6 at ¶ 6.)  In an effort to legitimize this intrusion, one agent sought, but did not receive, defendant's belated consent.  Id.  Thus, agents had acquired, impermissibly, some confirmation of their hunch that the crates might contain marijuana, which assuredly committed the agents to their investigative course.  That this access was improper is all-but-conceded in later affidavits of George MacLaughlin, dated March 12, 2004 and March 25, 2004, submitted in support of warrants for cell phones.  In the affidavits, Agent MacLaughlin noted that "TFA Joao Monteiro scrolled through the phone book of" defendant's cell phone, and that "[l]aw

-10-

enforcement officers reviewed the contents of the telephones, and created a list of various telephone numbers contained" in the target phones, but MacLaughlin "request[ed] that this Court not consider [this information]" in determining probable cause.  See [Second] Affidavit of George MacLaughlin, at p. 6, fn. 3, attached as Exhibit D, and [Third] Affidavit of George MacLaughlin, at p. 6, fn. 3, attached as Exhibit E.  What is plain is that the government obtained a fact, which it should not lawfully have known, which drove their continued, prolonged and unlawful custody of defendant.

Courts have routinely rejected warrantless arrests of persons and property on facts more indicative of probable cause than existed here.  In United States v. Ceballos, 654 F.2d 177, 179-180 (2nd Cir. 1981), where defendant was "completely unknown to the officers," id. at 184, the court found no probable cause to justify the arrest of the defendant in his car and the search of a paper bag, where defendant had exited a building known to be the residence of a drug dealer after a brief visit, carried a paper bag and looked up and down street "in a curious manner" before driving off. Id. at 179.  In United States v. Ingrao, 897 F.2d 860, 863 (7th Cir. 1990), the court found that police lacked probable cause to arrest the defendant after he was seen carrying a bag down a gangway leading to a known trafficker's home.  The court stated that, "without more, it cannot legally raise

suspicion concerning Ingrao." The agents had never seen Ingrao engage in illegal activity, had no information regarding him, and had not recognized him. Id. at 863-64. In United States v. Anderson, 981 F.2d 1560, 1566 (10th Cir. 1992), the court reversed the denial of a motion to suppress, ruling that probable cause was lacking for the arrest of a defendant who had driven a pick-up truck from the home of a suspected drug dealer, and who was later seen leaving the home on foot near the time of the arrests of others.

Here, no probable cause existed to take defendant into custody.

## II. THE FRUITS OF THE ILLEGAL ARREST MUST BE SUPPRESSED

The remedy for a warrantless arrest without probable cause is well settled: "if an arrest is not based on probable cause, then statements and evidence obtained as a result of the arrest are inadmissible." United States v. Fiasconao, 315 F.3d 28, 34 (1st Cir. 2002). The fruits of defendant's unlawful arrest include his statements, the seizures of property on his person, and the detention of the crates.

First, the defendant's statement, taken in the wake of the illegal arrest, must be suppressed. See Brown v. Illinois, 422 U.S. 590, 601-02 (1975) (defendant's statement, separated from his illegal arrest by less than two hours, suppressed under Wong

Sun); Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); United States v. Jorge, 865 F.2d 6, 9-10 (1st Cir. 1989).

Second, a search incident to an arrest requires a prior valid arrest. See Smith v. Ohio, 494 U.S. 541, 543 (1990) (reasoning that "[a]s we have had occasion in the past to observe, '[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification," citing Sibron v. New York, 392 U.S. 40, 63 (1968)). Where there was no lawful arrest, such evidence seized must be suppressed.

Third, post-arrest, the government called for a drug dog to come to the scene. This step betrayed their awareness that they did not have probable cause to open the crate or to seek a warrant to do so (indeed, even to hold defendant since defendant's custody depended entirely upon whether the crates contained marijuana). The detention of the crates was the fruit of the unlawful arrest of defendant.

At bottom, it is surely abhorrent to the Fourth Amendment to arrest first in the hope that probable cause will follow. Yet that was the course here. Police called for a drug dog(s) to come to the scene only after taking defendant "into custody," handcuffing him, confiscating his cellular telephones and surveying it for names of investigatory interest. The fruits of the arrest must be suppressed.

III. THE APPLICATION FOR SEARCH WARRANT FAILED TO
     ESTABLISH PROBABLE CAUSE

Police applied for a search warrant, but too late to cure the false arrest. Even so, the application for the warrant on its face contained insufficient information to establish probable cause based upon a canine sniff. The warrant application stated that a single dog, unnamed and without elaboration of its qualifications and experience, alerted to drugs in the crates. "The existence of probable cause based on an alert by a drug dog depends upon the dog's reliability. See United States v. Race, 529 F.2d 12, 14 (1st Cir. 1976)." United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999). Thus, in United States v. Lingenfelter, 997 F.2d 632 (9th Cir. 1993), the court, after noting that "the application for the warrant [must] establish[] the dog's reliability," stated that the submission to the magistrate included that the canine had "participated in approximately 300 hours of training searches, and that [the dog] has never given a false alert or failed to detect the drug and narcotic .... In all, [the dog] has performed approximately 500 investigations and has been successfully relied upon in the past to sniff out narcotics." Even in the Tenth Circuit, where a lesser standard prevails, the allegation that "[a] narcotics dog" was used would be insufficient. See United States v. Kennedy, 131 F.3d 1371, 1376-77 (10th Cir. 1997) ("As a general rule, a search warrant based on a narcotics canine alert will be

sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics.")

Here there was no allegation whether the unnamed dog was certified, nor was its training described. There was no disclosure of its track record, nor of its record relating to false alerts, nor how it alerted here. Since the dog alert drove the probable cause equation, it mattered a great deal what the dog did and whether that was reliable. Here, akin to the informant whose reliability was never affirmed, there is utter silence in the application to bolster the claim of a canine alert. See, e.g., United States v. Kolodziej, 712 F.2d 975, 977 (5th Cir. 1983) (where the affidavit failed to show basis of knowledge or reliability of informants, suppression order affirmed). In the case of an informant, a deficient showing of reliability may be overcome by a strong showing of basis of knowledge. See Illinois v. Gates, 462 U.S. 218, 233 (1983). But in the case of a dog, the entirety of the dog's probative offering lies in its spontaneous conduct (whether a bark, a rest or whatever else is alleged to constitute the "alert") and whether that conduct, because of the dog's training and reliability, meant something. Under this Circuit's Owens decision, there must be a showing of the dog's reliability to support probable cause and none appeared in the warrant.

IV. THE SEARCH WARRANT AFFIDAVIT OMITTED AND MISSTATED CRITICAL FACTS

In two important respects, the affidavit submitted in support of the search warrant misstated or omitted critical facts.

I. "The Same Customer"

The MacLaughlin Affidavit submitted in support of the search warrant stated:

> Further investigation of the label revealed that the crate in question was one of four packages that had been shipped from the same customer in Los Angeles, California to a shipping company named Airport Express, Inc. located at 250 Lee Burbank Hwy., in Revere, Massachusetts. [emphasis added]

A footnote accompanying this text stated:

> The investigation showed that the four packages were sent in two different batches from the same customer account number: 18276790.

MacLaughlin Aff. at ¶ 4 and fn. 1 [emphasis added]. Neither statement was accurate. The investigation showed that it was not the same "customer" who shipped the crate (Augment versus Gaynor) and that the so-called "same customer account number" was the airbill number assigned by Forward Air as shipper. Certainly, Det. Fratalia knew this. After all, he had accessed the Forward Air website, using the "Forward Air Airbill #" to activate the search engine and to track the shipment. See Exhibit A.

It made a critical difference whether the shipments were from a common customer. Treating the airbill number as a

-16-

customer number, worse, averring that the crates were shipped "from the same customer," served to link the three crates with the seized Dorchester crate as coming from a common source, not just a common shipping route.  The "same customer" assertion was made to offset conspicuous differences between the seized Dorchester crate and the three crates awaiting delivery in Revere, namely that the three crates were sent by a different person, to a different end customer, and were picked up at different times by different persons.

b.   The Mystery of the Dog(s)

   The government's affidavit averred that "<u>A</u> narcotics dog" was brought to the scene and "<u>the dog</u>" alerted. MacLaughlin Aff. at ¶ 5 [emphasis added], Exhibit B.  This allegation – that a single dog alerted – was repeated in the further Affidavit of Agent MacLaughlin submitted nine days later, on March 12, 2004, Exhibit D at ¶ 5.  The single drug dog of the Affidavits has become, in response to discovery requests for the dog's identity, <u>two</u> drug dogs, <u>both</u> of which allegedly alerted.  One would think that, if two dogs had alerted, this claim would surely have found its way into the affidavit (better two dogs than one).

   The crates, once disassembled, contained redundant layers of concealment, presumably to protect the contents against detection by a canine.  According to the DEA-6, the crates held plastic barrels which were "sealed inside cardboard boxes which were

sealed inside the wooden crates." DEA-6 at p. 8. The absence of detail about the "alert," given the manner of concealment, is disturbing. There are photographs aplenty here, but none of the dog(s) or what the dog(s) did.

There exist substantial questions about the canine alert, including whether one of the dogs failed to alert which would have necessitated a second dog. On both this ground and the "same customer" ground, there is substantial reason for a Franks hearing:

> "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

Franks v. Delaware, 438 U.S. 154, 155-6 (1978).

Defendant submits that he has made a substantial preliminary showing that false statements or omissions appeared in the application, requiring that a hearing be held under Franks v. Delaware.

CONCLUSION

For the reasons set forth above, defendant's arrest and the fruits of the unlawful arrest, including all statements and physical evidence, should be suppressed.

RYAN CARTER
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
   B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

Date: June 17, 2005