

FTZ | Services | Schedules | Locations | Track | About Us | Investor Relations | Contact Us | Site Index

This site is protected by copyright and trademark laws under U.S. and International law. All rights reserved.
Please review our underline{privacy policy} and underline{terms of use}.



EXHIBIT

A

ABOUT US

## Corporate Information

### Introduction

Forward Air Corporation believes it operates the largest and most comprehensive network of surface transportation for deferred air freight. The Company provides scheduled surface transportation through an expansive network of 80 terminals located on or near airports in the United States and Canada, including a central sorting facility in Columbus, Ohio, several regional hubs and direct shuttles. The Company provides these services as a cost effective alternative to air transportation of shipments that must be delivered at a specific time but are relatively less time-sensitive than traditional air freight or when air transportation is not economical. The Company has experienced rapid growth in revenue from $63.6 million in 1995 to $214.9 million in 2000, a 28% compounded annual rate, and in operating income from $6.4 million to $37.2 million over the same period, a 42% compounded annual rate. This growth has resulted from increased business with existing customers, the addition of new customers, expansion of the Company's terminal network and expansion of its service offerings.

The Company focuses its services on freight forwarders, integrators and airlines by locating terminals on or near all major airports and maintaining regularly scheduled transportation service between cities. The Company's operations involve receiving deferred air freight shipments at its terminals and transporting them by truck to the terminal nearest their destination. Freight is transported either through the Company's central sorting facility or, where justified by lane densities, through regional hubs or directly between terminals. As a largely non-asset based provider, the Company purchases its transportation requirements primarily from owner-operators and, to a lesser extent, from truckload carriers. The Company typically does not provide local pickup and delivery services nor does it place significant size and weight restrictions on shipments. Consequently, the Company does not market its services directly to shippers and does not compete directly with small package or overnight delivery services.

### Operations

Forward Air receives air freight from freight forwarders, domestic and international airlines and integrated air cargo carriers at 80 terminals located on or near airports in the United States and Canada. Shipments received at each terminal facility are consolidated and transported by truck through the Company's network to the terminal nearest the freight's ultimate destination. The Company's network consists of regularly scheduled service to and from each of its terminals through the Columbus, Ohio sorting facility or through regional hubs. The Company also operates regularly scheduled service directly between city pairs where sufficient volume of air freight warrants bypassing the Columbus sorting facility or a regional hub. When the shipment arrives at the terminal nearest the shipment's destination, the customer arranges for pick-up at the terminal and for final delivery.

The Company handles a broad range of freight. A typical shipment consists of a pallet load of high value freight, often computers, telecommunications equipment and other high-technology equipment, trade show exhibit materials, machinery and machine parts or apparel. During 2000, the average shipment weight was approximately 700 pounds, ranging from small boxes weighing only a few pounds to large shipments of several thousand pounds. Although the Company imposes no size or weight restrictions on shipments, it focuses its marketing and price structure on shipments of 200 pounds or more. As a result of its focus on larger freight shipments, the Company does not directly compete for most of its business with overnight couriers or small package delivery companies.

Forward Air provides overnight or second day service between most of its terminal facilities. The Company commits to transport shipments that same day if delivered to its terminal

facilities before specified late evening cut-off times, which vary by terminal. Departure and arrival times are provided to customers through a variety of Company-published literature and are expected to be available on the Internet in February 1999. In 1998, shipments handled by the Company arrived within 30 minutes of their scheduled arrival time over 98%.

## Terminals

The Forward Air network includes 80 terminals in the cities listed below.

| City | Airport Served | City | Airport Served |
|------|----------------|------|----------------|
| Albuquerque, NM | ABQ | Memphis, TN | MEM |
| Albany, NY | ALB | Miami, FL | MIA |
| Atlanta, GA | ATL | Milwaukee, WI | MKE |
| Austin, TX | AUS | Minneapolis, MN | MSP |
| Baltimore, MD | BWI | Mobile, AL | MOB |
| Baton Rouge, LA | BTR | Nashville, TN | BNA |
| Birmingham, AL | BHM | Newark, NJ | EWR |
| Boston, MA | BOS | Newburgh, NY | SWF |
| Brownsville, TX | BRO | New Orleans, LA | MSY |
| Buffalo, NY | BUF | New York, NY | JFK |
| Charleston, SC | CHS | Norfolk, VA | ORF |
| Charlotte, NC | CLT | Oklahoma City, OK | OKC |
| Chicago, IL | ORD | Omaha, NE | OMA |
| Cincinnati, OH | CVG | Orlando, FL | MCO |
| Cleveland, OH | CLE | Pensacola, FL | PNS |
| Columbia, SC | CAE | Philadelphia, PA | PHL |
| Columbus, OH | CMH | Phoenix, AZ | PHX |
| Corpus Christi, TX | CRP | Pittsburgh, PA | PIT |
| Dallas/Ft. Worth, TX | DFW | Portland, OR | PDX |
| Dayton, OH | DAY | Raleigh, NC | RDU |
| Denver, CO | DEN | Richmond, VA | RIC |
| Detroit, MI | DTW | Rochester, NY | ROC |
| El Paso, TX | ELP | Sacramento, CA | SMF |
| Greensboro, NC | GSO | Salt Lake City, UT | SLC |
| Greenville, SC | GSP | San Antonio, TX | SAT |
| Harlingen, TX | HRL | San Diego, CA | SAN |
| Hartford, CT | BDL | San Francisco, CA | SFO |
| Houston, TX | IAH | Seattle, WA | SEA |
| Huntsville, AL | HSV | St. Louis, MO | STL |
| Indianapolis, IN | IND | Syracuse, NY | SYR |
| Jackson, MS | JAN | Tampa, FL | TPA |
| Jacksonville, FL | JAX | Toledo, OH | TOL |
| Kansas City, MO | MCI | Tri Cities, TN | TRI |
| Knoxville, TN | TYS | Tulsa, OK | TUL |
| Lafayette, LA | LFT | Tuscon, AZ | TUS |
| Laredo, TX | LRD | Washington, DC | IAD |
| Las Vegas, NV | LAS | Montreal, Canada | YUL |
| Little Rock, AR | LIT | Ottawa, Canada | YOW |
| Los Angeles, CA | LAX | Toronto, Canada | YYZ |
| Louisville, KY | SDF | | |

| McAllen, TX.................................MFE | | |
|---|---|---|

Eighteen of these terminals, which handle relatively lower volumes of freight, are operated for Forward Air by independent agents.

## Shuttle Service and Regional Hubs

As Forward Air has built lane density between key markets, it has enhanced its regional service offerings by establishing direct terminal-to-terminal shuttles and regional overnight service. Direct service allows the Company to provide quicker scheduled service to customers at a lower cost by moving freight over the most direct route and eliminating the added cost of handling the freight at a central or regional hub sorting facility. Direct shuttles also reduce the likelihood of damage because of reduced handling of the freight. As the Company continues to increase volume between various city pairs, it intends to add direct shuttles. Approximately 90% of the cities served by the Company have regional overnight service. An example of this regional service is the Northeast Shuttle. Freight to be transported between Albany, Baltimore, Boston, Buffalo, Hartford, Newark, Newburgh, New York, Philadelphia, Rochester, Syracuse and Washington is transported either by overnight direct shuttle, as from Boston to Newark, or by overnight service routed through Newburgh. Where sufficient volume in a region warrants, the Company utilizes larger terminals as regional sorting hubs, which allow the Company to bypass the Columbus sorting facility, thereby improving operating efficiency and enhancing customer service. The Company's current regional hubs are located in Atlanta, Dallas/Ft. Worth, Denver, Kansas City, Los Angeles, New Orleans, Newburgh, Orlando and San Francisco.

## Shipments

Since operations were commenced in November 1990, the weekly volume of freight handled by the Company has increased from an average of approximately 1.2 million pounds to over 17.3 million pounds per week as shown below:

|  | Average Weekly Volume In Pounds |
|---|---|
|  | (In Millions) |
| 1990...................................... | 1.2 |
| 1991...................................... | 1.4 |
| 1992...................................... | 2.3 |
| 1993...................................... | 3.8 |
| 1994...................................... | 7.4 |
| 1995...................................... | 8.5 |
| 1996...................................... | 10.5 |
| 1997...................................... | 12.4 |
| 1998...................................... | 15.4 |
| 1999...................................... | 19.4 |
| 2000...................................... | 23.9 |
| 2001...................................... | 24.3 |

## Customers and Marketing

Forward Air's customers are freight forwarders, domestic and international airlines and integrated air cargo carriers. The Company's freight forwarder customers vary in size from small, independent, single facility companies to large, international logistics companies. During 2000, the Company's top five customers accounted for approximately 18% of the revenue.

The Company markets its services through a sales and marketing department consisting of full-time Area Sales Managers located in various regions of the United States who report to five regional Vice Presidents of Sales and two Regional Sales Directors. The Company's senior management also is actively involved in the sales and marketing function at the national account level and supports local sales activity when appropriate. Salespersons are offered the opportunity to earn incentive bonuses that recognize the effectiveness of their marketing efforts.

Forward Air has a strong commitment to marketing and focuses on freight forwarders, domestic and international airlines and integrated air cargo carriers that have time sensitive shipping requirements requiring customized services. The Company also participates in air cargo trade shows and advertises its services through extensive direct mail programs and point of sale material.

## Logistics Services

Many customers are increasingly demanding more than the simple movement of freight from their transportation providers. To meet these needs, the Company continually seeks ways to customize its existing services and add new services by utilizing its existing facilities in non-peak hours and expending incremental labor hours to add value to its product offerings. The Company provides these services to directly benefit customers, particularly the smaller freight forwarders who cannot provide the services for themselves, attract new customers and improve utilization of the existing network by increasing revenue without corresponding increases in costs.

Many of the Forward Air's terminals sublet dock/warehouse or office space to appropriate tenants. The Company also provides logistics services, such as customs brokerage, which includes charging customs validation fees, terminal services fees, storage fees, customs fees, document handling fees, Canadian transborder fees, temporary inbond fees, immediate transport fees, transportation and exportation fees and house air waybill/consolidation fees for both import and export shipments, and terminal handling, which includes aircraft pallet buildup/breakdown, ocean container buildup/breakdown and reconsolidation.

Three additional service categories provided to customers are pickup, delivery and exclusive use vehicles. These services are separate from the Company's point to point LTL linehaul. Freight is picked up from the freight forwarder, or other customer, and/or delivered to the customer at the appropriate destination. Exclusive use vehicles are utilized when the customer tenders more than 10,000 pounds of freight or requires a more demanding service level than typical point to point service.

## Technology and Information Systems

A primary component of the Forward Air's growth strategy is the regular enhancement of its information systems. The Company has invested and will continue to invest significant management and financial resources to the enhancement of its information systems in an effort to provide accurate and real time information to its management and customers. The Company believes the ability to provide accurate real time information on the status of shipments, both internally (to ensure on-time delivery and efficient operations) and to customers, will become increasingly important. The Company believes that its efforts in this area will result in both competitive service advantages and increased productivity throughout the Forward Air network.

In 1995, Forward Air began development of a comprehensive freight order entry, tracking and billing system. The Company initiated roll out of Phase I of the system in the second quarter of 1997 and completed installation of Phase I in the first quarter of 1998. As part of the roll out, the Company implemented a real time, dedicated communications network that links all of its terminals, customer service and administrative locations. The system permits the Company to track and trace a shipment from initial entry through the transportation process to the point of delivery and through the billing and collection process. Through the system, management can access daily financial information covering the entire network, a particular terminal, a particular customer or a given shipment.

## Corporate History

**1988 - Forward Air** began in 1988 when Landair Transport entered into a contract agreement with North American Van Lines to provide less-than-truckload scheduled air cargo service through a hub and spoke network centered in Columbus, Ohio.

**1990 -** In 1990, the **Forward Air** product offering came under the direction and control of Landair Transport.

**1993 -** Landair Transport (parent for **Forward Air**) became Landair Services, Inc. through an initial public stock offering. **Forward Air** continued to be the largest subsidiary.

**1998 -** Landair Services, Inc. changed its name to **Forward Air** Corporation and spun off Landair Corporation as a separate publicly-traded company. **Forward Air** now stands alone as the unique, financially sound, publicly-traded, industry leader in the deferred airfreight industry.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            v.           )
                         )    Case Number:
                         )    Magistrate Number: 04M-1008-JGD
RYAN CARTER,             )
  a/k/a Noah Milloy      )
  a/k/a Mark James,      )
  a/k/a Mark Jones,      )
  a/k/a Mark Jacob,      )
  a/k/a Nigel Smart      )
         Defendant.      )

## AFFIDAVIT OF TASK FORCE AGENT GEORGE J. MacCLAUGHLIN

I, George MacLaughlin, being duly sworn, depose and state as
follows:

### Agent Background and Purpose of Affidavit

1.   I am employed by the Milton Police Department.  I have
been so employed for the past 33 years.  During the last eight
years, I have been assigned to the United States Department
Justice, Drug Enforcement Administration ("DEA") Task Force.
Prior to joining the DEA, I was assigned to the Norfolk County
District Attorney's Drug Task Force, beginning in 1988.  During
the course of my law enforcement career, I have received training
from the Massachusetts Criminal Justice Training Council, as well
as the DEA.  I have participated in hundreds of criminal
investigations involving drug trafficking, including but not
limited to, the execution of arrest warrants and search warrants
relating to the trafficking of controlled substances.  I also


EXHIBIT
B

have participated in various aspects of investigatory work,
including undercover surveillance, and have participated in
hundreds of narcotics-related arrests.

2.    I submit this Affidavit in support of a criminal
complaint charging RYAN CARTER, a/k/a Noah Milloy, a/k/a Mark
James, a/k/a Mark Jones, a/k/a Mark Jacob, a/k/a Nigel Smart
("CARTER") with possession of marijuana with intent to
distribute, in violation of 21 U.S.C. § 841(a)(1), and in support
of an application for a search warrant for the premises set forth
below.  Based on the facts set forth in this affidavit, I
respectfully submit that there is probable cause to believe that
on March 3, 2004, CARTER possessed marijuana with intent to
distribute, and that there is presently concealed in the premises
known and described as three wooden shipping crates each bearing
an address label with GM Import Exports Corp., 315 East Redondo
Beach, Blvd., Gardena, CA as shipper, and James O'Malley, 12
Brookview St., Dorchester, Massachusetts as recipient, currently
located at the warehouse of Airport Express, 250 Lee Burbank Hwy,
Revere, Massachusetts as more fully described below ("Target
Premises"), the items described in Attachment A hereto, all of
which constitute evidence, fruits, and instrumentalities of,
inter alia, violations of Title 21, United States Code, Section
841(a)(1), which prohibits the possession of controlled
substances with intent to distribute.  The information set forth
herein is based on my own personal knowledge and on information

-2-

herein is based on my own personal knowledge and on information provided to me by other law enforcement agents.  As the purpose of this affidavit is only to establish probable cause for the complaint against CARTER and the search of the Target Premises, I have not set forth each and every fact known to me concerning the investigation.

**Facts and Circumstances**

3.    On or about March 2, 2004, members of the Boston Police Department Youth Violent Strike Force attempted to stop the occupants of a Mitsubishi sports utility vehicle that was traveling approximately 45 miles per hour in a 30 mile per hour zone in Dorchester, Massachusetts.  The operator of the car in question refused to pull over, and led the officers on a high speed chase through a residential neighborhood.  Eventually, the car was stopped, and the driver (after a foot chase) and sole passenger (who did not flee) were both arrested.  Pursuant to the arrest, the officers discovered a loaded handgun on the floor of the rear passenger seat inside a black bag, and one freight crate in the rear cargo area.  A narcotics dog alerted to the presence of narcotics inside the crate.

4.    The officers obtained a search warrant to inspect the contents of the crate, and upon opening the crate, discovered approximately 108 pounds (55 kilograms) of marijuana therein.  On the exterior of the crate, the officers discovered a shipping

-3-

label.  Further investigation of the label revealed that the
crate in question was one of four packages that had been shipped
from the same customer in Los Angeles, California to a shipping
company named Airport Express, Inc. located at 250 Lee Burbank
Hwy., in Revere, Massachusetts.[1]  Based on this information, the
local officers established surveillance at Airport Express, and
contacted agents of Task Force One of the Drug Enforcement
Administration ("DEA") to request assistance.

    5.  At approximately 7:45 this morning, law enforcement met
with employees of Airport Express, and were shown the three
crates addressed to James O'Malley, which were still inside the
company's warehouse.  An inspection of the crates revealed that
each crate contained a shipping label listing "James O'Malley, 12
Brookview St., Dorchester, MA 02124, 617-304-5942 " as the
intended recipient.  Officers then waited to see who, if anyone,
would come claim the crates.  At approximately 8:00 a.m., CARTER,
driving a 14' U-Haul truck, arrived at the premises of Airport

---

[1]     The investigation showed that the four packages were
sent in two different batches from the same customer account
number: 18276790.  One batch contained three crates and the other
batch one crate.  The invoice for the three crates listed the
"shipper" as Robert Gaynor, 8126 W. Imperial Hwy, Lynwood, CA
90262, and the "consignee" as James O'Malley, 12 Brookview St.,
Dorchester, MA 02124.  The shipping label on each crate showed GM
Import Exports Corp., 315 East Redondo Beach Blvd., Gardena, CA
90248 as the shipper, and "James O'Malley, 12 Brookview St.,
Dorchester, MA 02124, 617-304-5942" as the intended recipient.
The invoice for the single crate listed the "shipper" as Charles
Augment, 15130 Indiana Ave., Paramount, CA 90723, and the
"consignee" as Doreen Grant, 82 Fairmont Ave., Hyde Park, MA
02136.

-4-

Express.  CARTER then came inside, signed for the three crates
using the name "Mark James," and requested assistance in loading
them onto the U-Haul.[2]  At CARTER's direction, one of the
employees of Airport Express lifted one of the three crates with
a forklift and drove the forklift to the loading dock, to which
CARTER had backed up the U-Haul truck, with the rear door open.
Just before the crate was placed into the truck, law enforcement
approached CARTER, who was standing next to the U-Haul truck, and
took him into custody.  A narcotics dog was brought to the scene,
and the dog alerted to the presence of narcotics inside of all
three crates.  The crates were then secured and placed in a
secure location at the warehouse, where they remain under
surveillance by law enforcement agents.

        6.   After CARTER was taken into custody, he was read his
rights under Miranda.  CARTER stated that he understood these
rights, and agreed to answer questions.  Initially, CARTER lied
about his identity, insisting that he was Noah Milloy, which is
the name on the Massachusetts driver's license he had in his
possession, and the identity he used to rent the U-Haul truck.
CARTER also lied about the telephone number on the shipping
labels (617-304-5942), which was identified as "work" in the

_____

        [2]    Further investigation revealed that between August 2003
and February 2004, CARTER signed for seven other crates delivered
to Airport Express using the names Mark James, Mark Jacob, Mark
Jones.  Copies of these receipts, along with a copy of the
receipt signed today, are attached hereto as Exhibit 1.

phonebook of a Nextel cellular telephone that CARTER had in his possession, and which CARTER claimed was his personal cell phone. Initially, CARTER claimed that the number did not belong to anyone in particular, and that the target phone simply rang when dialed. After the dog alerted to the crates, CARTER admitted his true name, and stated that the telephone number on the shipping labels corresponded to a cellular telephone that he had stuffed in between the cushions of the rear seat of the police vehicle where CARTER had been seated earlier.

7. CARTER stated that he had been given the telephone by an Hispanic male named "Mr. O'Malley," the previous day (March 2, 2004) at Dudley Square in Roxbury. CARTER claimed that "Mr. O'Malley" instructed him to go pick up the crates from Airport Express, and to deliver them to him a the address on the labels. CARTER claimed that "Mr. O'Malley" told him that the telephone was to be used solely in relation to the pick up and delivery of the crates. CARTER further claimed that although he and "Mr. O'Malley" had never discussed payment for his services, he expected to be paid $400 to $500.

**Conclusion**

8. Based on the information set forth in this Affidavit, I believe that probable cause exists to believe that on or about March 3, 2004, RYAN CARTER knowingly and intentionally possessed Marijuana with intent to distribute, and that a search of the Target Premises will produce some, if not all of the items

-6-

described in Attachment A hereto.

GEORGE MacLAUGHLIN
Task Force Agent
Drug Enforcement Administration

Sworn and subscribed to before me at Boston, Massachusetts, this 3rd day of March, 2004.

JUDITH G. DEIN
United States Magistrate Judge

-7-

## Attachment A

## Items to be Seized

1.    Controlled substances and materials relating to the distribution of controlled substances.

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

In the Matter of the Search of

(Name, Address or brief description of person or property to be searched)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

```
The Premises Known as
Three wooden shipping crates each bearing
an address label with GM Import Exports Corp.,        M. J. No. 04M-1008-JGD
315 East Redondo Beach, Blvd., Gardena, CA
as shipper, and James O'Malley, 12 Brookview St.,
Dorchester, Massachusetts as recipient,
currently located at the warehouse of
Airport Express, 250 Lee Burbank Hwy,
Revere, Massachusetts
```

I, being duly sworn, depose and say:

I am a <u>Task Force Agent of the Drug Enforcement Administration</u> and have reason to believe that on the property known as:

```
Three wooden shipping crates each bearing an address label with GM Import
Exports Corp., 315 East Redondo Beach, Blvd., Gardena, CA as shipper, and
James O'Malley, 12 Brookview St., Dorchester, Massachusetts as recipient,
currently located at the warehouse of Airport Express, 250 Lee Burbank Hwy,
Revere, Massachusetts as more fully described the Affidavit of Task Force
Agent George J. MacLaughlin.
```

in the _____ District of **Massachusetts** there is now concealed a certain person or property, namely (describe the person or property)

```
the items described in Attachment A to the Affidavit of  Task Force Agent George J.
MacLaughlin, which is attached hereto and incorporated herein by reference,
```

which are (give alleged ground for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

```
Evidence and instrumentalities of violations of Title 21, United States Code,
Sections 841(a)(1), as described more fully in Attachment A hereto, which
prohibit the conspiracy to import controlled substances,
```

The facts to support the issuance of a Search Warrant are as follows:

```
See attached Affidavit of  Task Force Agent George J. MacLaughlin.
```

Continued on the attached sheet and made a part hereof:        X Yes    ☐ No

Signature of Affiant

**GEORGE J. MacLAUGHLIN**
**Task Force Agent, DEA**

Sworn to before me and subscribed in my presence,

March 3, 2004                    at    Boston, Massachusetts
Date                                         City and State


JUDITH G. DEIN                          Signature of Judicial Officer
UNITED STATES MAGISTRATE JUDGE

2





# *United States District Court*

_____ DISTRICT OF _____ **MASSACHUSETTS**

In the Matter of the Search of
(Name, address or brief description of property or premises to be searched)

## APPLICATION
## FOR SEARCH WARRANT

**1. One Grey Motorola i730 Nextel
cellular telephone bearing Serial Number
364VDW1MS6;**

**2. One Blue Motorola i90c Nextel
cellular telephone bearing Serial Number
919TBW0V32; and**

**3. One Grey Kyocera Virgin Mobile
cellular telephone bearing "IC" Serial Number
3572A-KE433,**

**all of which were seized on March 3, 2004 from
Ryan Carter in Revere, Massachusetts,
and currently in the possession of the Drug
Enforcement Administration**

Mag. Judge Number: 04-M-1007-JGD
Search Warrant Application Number:

*04M-1028-JGD*

I, Task Force Agent George J. MacLaughlin, United States Drug Enforcement Administration (DEA) ,
being duly sworn and depose and say:

I am a Task Force Agent of the DEA  and have reason to believe that

☐ on the person of or  ☒ on the premises known as (name, description and/or location)

**One Grey Motorola i730 Nextel cellular telephone bearing Serial Number 364VDW1MS6; One Blue
Motorola i90c Nextel cellular telephone bearing Serial Number 919TBW0V32; and One Grey
Kyocera Virgin Mobile cellular telephone bearing "IC" Serial Number 3572A-KE433 all of which
were seized on March 3, 2004 from Ryan Carter in Revere, Massachusetts, and currently in the
possession of the Drug Enforcement Administration,**

in the District of  _MASSACHUSETTS_  there is now concealed a certain person or property, namely

### See AFFIDAVIT OF GEORGE J.MacLAUGHLIN attached hereto

which is relevant to an investigation of a violation of Title 21 U.S.C. Sections 841(a)(1) and 846.
The facts supporting the issuance of a search warrant as attached in an affidavit made a part
hereof.



EXHIBIT
D

GEORGE McLaughlin
Task Force Agent
Drug Enforcement Administration


Sworn and subscribed to before me at Boston, Massachusetts, this 12th day of March, 2004.


JUDITH G. DEIN
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            v.           )
                         )    Magistrate Number: 04-M-1007-JGD
                         )    Search Warrant Number:
RYAN CARTER              )

## AFFIDAVIT OF TASK FORCE AGENT GEORGE J. MacLAUGHLIN

I, George MacLaughlin, being duly sworn, depose and state as follows:

**Agent Background and Purpose of Affidavit**

1.    I am employed by the Milton Police Department.  I have been so employed for the past 33 years.  During the last eight years, I have been assigned to the United States Department Justice, Drug Enforcement Administration ("DEA") Task Force. Prior to joining the DEA, I was assigned to the Norfolk County District Attorney's Drug Task Force, beginning in 1988.  During the course of my law enforcement career, I have received training from the Massachusetts Criminal Justice Training Council, as well as the DEA.  I have participated in hundreds of criminal investigations involving drug trafficking, including but not limited to, the execution of arrest warrants and search warrants relating to the trafficking of controlled substances.  I also have participated in various aspects of investigatory work, including undercover surveillance, and have participated in hundreds of narcotics-related arrests.

2.    I submit this affidavit, pursuant to, Rule 41 of the
Federal Rules of Criminal Procedure, in support of an application
for a warrant to search three cellular telephones: (1) a grey
Kyocera Virgin Mobile cellular telephone bearing "IC" serial
number 3572A-KE433 ("the  KYOCERA cell phone"), (2) a grey
Motorola i730 Nextel cellular telephone bearing "SN" serial
number 364VDWIMS6 ("the GREY NEXTEL cell phone"), and (3) a blue
Motorola i90c Nextel cellular telephone bearing "SN" serial
number 919TBWOV32 ("the BLUE NEXTEL Cell phone"), all three of
which were seized from defendant RYAN CARTER ("CARTER") on March
3, 2004 (collectively "the Target Telephones").  As set forth
herein, there is probable cause to believe that the Target
Telephones contain information that constitutes evidence, fruits,
or instrumentalities relating to violations of Title 21, United
States Code, Sections 841(a)(1) and 846.

3.    The information set forth herein is based on my own
personal knowledge and on information provided to me by other law
enforcement agents.  As the purpose of this affidavit is only to
establish probable cause to search the Target Telephones, I have
not set forth each and every fact known to me concerning the
investigation.

**Facts and Circumstances**

4.    On or about March 2, 2004, members of the Boston Police
Department Youth Violent Strike Force attempted to stop the

-2-

occupants of a Mitsubishi sports utility vehicle that was
traveling approximately 45 miles per hour in a 30 mile per hour
zone in Dorchester, Massachusetts.  The operator of the car in
question refused to pull over, and led the officers on a high
speed chase through a residential neighborhood.  Eventually, the
car was stopped, and the driver (after a foot chase) and sole
passenger (who did not flee) were both arrested.  The driver was
identified as Marlon Straw, who resides at 125 Garfield Ave., #1,
Hyde Park, Massachusetts.  The passenger was identified as Robert
Hylton, who resides at 70 Fairlawn Street, Dorchester,
Massachusetts.

5.   Pursuant to the arrest, the officers discovered a
loaded handgun on the floor of the rear passenger seat inside a
black bag, and one freight crate in the rear cargo area.  A
narcotics dog alerted to the presence of narcotics inside the
crate.  The officers obtained a state search warrant to inspect
the contents of the crate, and upon opening the crate, discovered
approximately 108 pounds (55 kilograms) of a green leafy
substance which I have seen, and which, based on my training and
experience, I believe to be marijuana.  On the exterior of the
crate, the officers discovered a shipping label.  Further
investigation of the label revealed that the crate in question
was one of four packages that had been shipped from the same
customer in Los Angeles, California to a shipping company named
Airport Express, Inc. located at 250 Lee Burbank Hwy., in Revere,

-3-

Massachusetts.[1]  Based on this information, the local officers
established surveillance at Airport Express, and contacted agents
of Task Force One of the DEA to request assistance.

     6.    On March 3, 2004, at approximately 7:45 a.m., law
enforcement met with employees of Airport Express, and were shown
the three crates addressed to James O'Malley, which were still
inside the company's warehouse.  An inspection of the crates
revealed that each crate contained a shipping label listing
"James O'Malley, 12 Brookview St., Dorchester, MA 02124, 617-304-
5942 " as the intended recipient.  Officers then waited to see
who, if anyone, would come claim the crates.  At approximately
9:15 a.m., CARTER, driving a 14' U-Haul truck, arrived at the
premises of Airport Express.  CARTER then came inside, signed for
the three crates using the name "Mark James," and requested
assistance in loading them onto the U-Haul.[2]  At CARTER's

---

     [1]    The investigation showed that the four packages were
sent in two different batches from the same customer account
number: 18276790.  One batch contained three crates and the other
batch one crate.  The invoice for the three crates listed the
"shipper" as Robert Gaynor, 8126 W. Imperial Hwy, Lynwood, CA
90262, and the "consignee" as James O'Malley, 12 Brookview St.,
Dorchester, MA 02124.  The shipping label on each crate showed GM
Import Exports Corp., 315 East Redondo Beach Blvd., Gardena, CA
90248 as the shipper, and "James O'Malley, 12 Brookview St.,
Dorchester, MA 02124, 617-304-5942" as the intended recipient.
The invoice for the single crate listed the "shipper" as Charles
Augment, 15130 Indiana Ave., Paramount, CA 90723, and the
"consignee" as Doreen Grant, 82 Fairmont Ave., Hyde Park, MA
02136.

     [2]    Further investigation revealed that between August 2003
and February 2004, CARTER signed for seven other crates delivered
to Airport Express using the names Mark James, Mark Jacob, Mark

-4-

direction, one of the employees of Airport Express lifted one of
the three crates with a forklift and drove the forklift to the
loading dock, to which CARTER had backed up the U-Haul truck,
with the rear door open.  Just before the crate was placed into
the truck, law enforcement approached CARTER, who was standing
next to the U-Haul truck, and took him into custody.  A narcotics
dog was brought to the scene, and the dog alerted to the presence
of narcotics inside of all three crates.  The crates were then
secured and placed in a secure location at the warehouse, while
the authorities applied for a search warrant.

7.    Later on March 3, 2004, this Honorable Court issued a
warrant authorizing a search of the three crates.  Upon executing
the warrant, law enforcement found a total of approximately 681
pounds (309 kilograms) of a green, leafy substance, which based
on my training and experience, I believe to be marijuana.
Samples of this substance have been sent to the DEA Northeast
Laboratory for confirmatory testing.

8.    After CARTER was taken into custody, and before the
execution of the search warrant, CARTER was read his rights under
Miranda.  CARTER stated that he understood these rights, and
agreed to answer questions.  Initially, CARTER lied about his
identity, insisting that he was Noah Milloy, which is the name on
the Massachusetts driver's license he had in his possession, and

_____

Jones.

-5-

the identity he used to rent the U-Haul truck. CARTER also lied

about the telephone number on the shipping labels (617-304-

5942).[3] Initially, CARTER claimed that the number did not belong

to anyone in particular, and that the target phone simply rang

when dialed. After the dog alerted to the crates, CARTER

admitted his true name, and stated that the telephone number on

the shipping labels corresponded to a cellular telephone that he

had stuffed in between the cushions of the rear seat of the

police vehicle where CARTER had been seated earlier (the KYOCERA

cell phone).

9. When questioned about the KYOCERA cell phone, CARTER

stated that he had been given the telephone by an Hispanic male

named "Mr. O'Malley," the previous day (March 2, 2004) at Dudley

Square in Roxbury. CARTER claimed that "Mr. O'Malley" instructed

him to go pick up the crates from Airport Express, and to deliver

them to him at the address on the labels. CARTER claimed that

"Mr. O'Malley" told him that the telephone was to be used solely

in relation to the pick up and delivery of the crates. CARTER

further claimed that although he and "Mr. O'Malley" had never

───────────────

[3]    CARTER identified the GREY NEXTEL cell phone as his
personal cell phone. TFA Joao Monteiro scrolled through the
phone book of this telephone and noticed that the telephone
number on the three crates was listed in the GREY NEXTEL under
"work." However, I have included this information only for the
sake of completeness. I am not relying upon this information,
and respectfully request that this Court not considered it, in
determining whether probable cause exists to search the Target
Telephones.

discussed payment for his services, he expected to be paid $400 to $500. When questioned about how he got to the U-Haul depot, CARTER stated that he had driven a rental car that had been rented by a "friend named Marlon."[4]

**Probable Cause**

10.    Based upon my training and experience, and upon the training and experience of other law enforcement agents with whom I have spoken, I am aware that cellular telephones are a common method of communication used by drug dealers. In particular, because of the "direct connect" feature of Nextel telephones (which permits the users to use the telephones as private two-way radios) drug dealers have increasingly used Nextel telephones to facilitate their narcotics trafficking. Based on the fact that CARTER has four prior narcotics convictions (spanning from 1991 to 1999); that CARTER came to collect three of four crates that contained close to 800 pounds of marijuana; that the Boston Police seized the fourth crate from a vehicle containing a loaded handgun that was being driven by a person named Marlon Straw (who fled the scene after leading the police on a high-speed chase);

---

[4]    Budget Car Rental records show that the vehicle in question had been rented on February 19, 2004 by an individual signing his name as "Marlon Passley" (although the name was entered into the computer as "Marlon Presly"). When law enforcement ran the Massachusetts driver's license number this individual provided to Budget, the license number came back to "Marlon Passley, 180 Windsor Street, #10, Cambridge, Massachusetts." Further review of the rental agreement shows that "Noah Milloy," the name on CARTER's Massachusetts driver's license, was listed as an additional driver.

that the rental car CARTER drove to the U-Haul depot was rented by an individual named Marlon Passley; that CARTER lied about the telephone number on the three crates he came to collect; and that CARTER was in possession of three cellular telephones (two of which were Nextel phones) at the time of his arrest, there is probable cause to believe that CARTER had accomplices in this criminal enterprise, and that information related to contacts between CARTER and other criminal associates is located within the Target Telephones, and that the Target Telephones, therefore, contain certain information that constitute evidence, fruits, instrumentalities of or other information relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846.

**Conclusion**

11.    Based on the information set forth in this Affidavit, I believe that probable cause exists to believe that a search of the Target Telephones will produce some, if not all of the items described in Attachment A hereto.

_____
GEORGE MacLAUGHLIN
Task Force Agent
Drug Enforcement Administration


Sworn and subscribed to before me at Boston, Massachusetts, this 12th day of March, 2004.


_____
JUDITH G. DEIN
United States Magistrate Judge

-8-

## Attachment A


## Items to be Seized


1.    Phone book entries including names, telephone numbers, and addresses; call lists showing recent incoming, outgoing, and missed calls; calendar events; notes; and notices of existing text messages and voicemail messages.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            v.           )
                         )   Magistrate Number: 04-M-1007-JGD
                         )   Search Warrant Number: 04M-1056-J6\
RYAN CARTER              )

### AFFIDAVIT OF TASK FORCE AGENT GEORGE J. MacLAUGHLIN

I, George MacLaughlin, being duly sworn, depose and state as follows:

**Agent Background and Purpose of Affidavit**

1.    I am employed by the Milton Police Department.  I have been so employed for the past 33 years.  During the last eight years, I have been assigned to the United States Department Justice, Drug Enforcement Administration ("DEA") Task Force. Prior to joining the DEA, I was assigned to the Norfolk County District Attorney's Drug Task Force, beginning in 1988.  During the course of my law enforcement career, I have received training from the Massachusetts Criminal Justice Training Council, as well as the DEA.  I have participated in hundreds of criminal investigations involving drug trafficking, including but not limited to, the execution of arrest warrants and search warrants relating to the trafficking of controlled substances.  I also have participated in various aspects of investigatory work, including undercover surveillance, and have participated in hundreds of narcotics-related arrests.

EXHIBIT
E

2.    I submit this affidavit, pursuant to Rule 41 of the
Federal Rules of Criminal Procedure, in support of an application
for a warrant to search three cellular telephones: (1) a gray
Motorola i95cl Nextel cellular telephone (with a blue face)
bearing "IMEI" serial number 000100619508290, which was seized
from Marlon Straw on March 2, 2004 ("the STRAW NEXTEL cell
phone"), (2) a gray M56 Siemans AT&T Wireless cellular telephone
bearing serial number S30880-S6350-A102-1, which was seized from
Marlon Straw on March 2, 2004 ("the STRAW AT&T cell phone"), and
(3) a gray Motorola i730 Nextel cellular telephone bearing "SN"
serial number 364VDUONC9, which was seized from Robert HYLTON on
March 2, 2004 ("the HYLTON NEXTEL cell phone") (collectively "the
Target Telephones").  As set forth herein, there is probable
cause to believe that the Target Telephones contain information
that constitutes evidence, fruits, or instrumentalities relating
to violations of Title 21, United States Code, Sections 841(a)(1)
and 846.

3.    The information set forth herein is based on my own
personal knowledge and on information provided to me by other law
enforcement agents.  As the purpose of this affidavit is only to
establish probable cause to search the Target Telephones, I have
not set forth each and every fact known to me concerning the
investigation.

-2-

**Facts and Circumstances**

4.    On or about March 2, 2004, members of the Boston Police
Department Youth Violent Strike Force attempted to stop the
occupants of a Mitsubishi sports utility vehicle that was
traveling approximately 45 miles per hour in a 30 mile per hour
zone in Dorchester, Massachusetts.  The operator of the car in
question refused to pull over, and led the officers on a high
speed chase through a residential neighborhood.  Eventually, the
car stopped, and the driver, later identified as MARLON STRAW,
was taken into custody, after a foot chase.  During the chase,
the STRAW NEXTEL cell phone fell out of one of STRAW's pockets.
In the meantime, the sole passenger in the Mitsubishi, later
identified as ROBERT HYLTON, surrendered to the police, while
exclaiming, "It's weed in the car, it's weed!"  The HYLTON NEXTEL
cell phone was found in one of HYLTON's front pants pockets.  The
STRAW AT&T cell phone was found on the driver's seat of the
Mitsubishi.

5.    Subsequent to taking STRAW and HYLTON into custody,
the officers obtained a state search warrant to inspect the
contents of a freight crate that was found in the rear cargo area
of the Mitsubishi.  During the execution of this search warrant,
the officers discovered a loaded handgun inside a black bag on
the floor of the rear passenger seat of the Mitsubishi.  Upon
opening the crate, officers discovered approximately 108 pounds

-3-

(55 kilograms) of a green leafy substance which I have seen, and
which, based on my training and experience, I believe to be
marijuana.  On the exterior of the crate, the officers discovered
a shipping label.  Further investigation of the label revealed
that the crate in question was one of four packages that had been
shipped from the same customer in Los Angeles, California to a
shipping company named Airport Express, Inc. located at 250 Lee
Burbank Hwy., in Revere, Massachusetts.[1]  Based on this
information, the local officers established surveillance at
Airport Express, and contacted agents of Task Force One of the
DEA to request assistance.

     6.    On March 3, 2004, an individual named RYAN CARTER
arrived at the premises of Airport Express to pick up the three
crates, which were still inside the company's warehouse.  CARTER
signed for the three crates using the name "Mark James."[2]  CARTER

---

     [1]    The investigation showed that the four packages were
sent in two different batches from the same customer account
number: 18276790.  One batch contained three crates and the other
batch one crate.  The invoice for the three crates listed the
"shipper" as Robert Gaynor, 8126 W. Imperial Hwy, Lynwood, CA
90262, and the "consignee" as James O'Malley, 12 Brookview St.,
Dorchester, MA 02124.  The shipping label on each crate showed GM
Import Exports Corp., 315 East Redondo Beach Blvd., Gardena, CA
90248 as the shipper, and "James O'Malley, 12 Brookview St.,
Dorchester, MA 02124, 617-304-5942" as the intended recipient.
The invoice for the single crate listed the "shipper" as Charles
Augment, 15130 Indiana Ave., Paramount, CA 90723, and the
"consignee" as Doreen Grant, 82 Fairmont Ave., Hyde Park, MA
02136.

     [2]    Further investigation revealed that between August 2003
and February 2004, CARTER signed for seven other crates delivered
                                              (continued...)

-4-

was taken into custody, and, that same day, this Honorable Court issued a warrant authorizing a search of the three crates. Upon executing the warrant, law enforcement found a total of approximately 681 pounds (309 kilograms) of a green, leafy substance, which based on my training and experience, I believe to be marijuana.

7.    A review of STRAW's criminal history shows that on February 17, 1993, STRAW was sentenced to 15 years' imprisonment following his conviction in Suffolk County Superior Court for Trafficking in a Class B Controlled Substance (cocaine). STRAW also has pending indictments in Suffolk County Superior Court charging him with distribution of marijuana and various weapons offenses, stemming from his arrest on June 19, 2002 and July 5, 2002. HYLTON does not have any criminal convictions or pending charges, other than those associated with his arrest on March 2, 2004.

**Probable Cause**

8.    Based upon my training and experience, and upon the training and experience of other law enforcement agents with whom I have spoken, I am aware that cellular telephones are a common method of communication used by drug dealers. In particular, because of the "direct connect" feature of Nextel telephones

---

[2](...continued)
to Airport Express using the names Mark James, Mark Jacob, Mark Jones.

-5-

(which permits the users to use the telephones as private two-way radios) drug dealers have increasingly used Nextel telephones to facilitate their narcotics trafficking.  Based on the facts and circumstances of the arrest of STRAW and HYLTON; that STRAW has a prior narcotics conviction and pending narcotics distribution charges; that CARTER came to collect three crates contained close to 800 pounds of marijuana, which came from the same shipper as the crate found in the Mitsubishi being operated by STRAW; and that STRAW and HYLTON were in possession of the Target Telephones (two of which were Nextel phones) at the time of their arrest, there is probable cause to believe that STRAW and HYLTON had accomplices in this criminal enterprise, and that information related to contacts between STRAW and HYLTON and other criminal associates is located within the Target Telephones, and that the Target Telephones, therefore, contain certain information that constitute evidence, fruits, instrumentalities of or other information relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846.[3]

---

[3]    Subsequent to seizing the Target Telephones, Law enforcement officers reviewed the contents of the telephones, and created a list of various telephone numbers contained therein. However, I have included this information only for the sake of completeness.  I am not relying upon this information, and respectfully request that this Court not considered it, in determining whether probable cause exists to search the Target Telephones.

**Conclusion**

9.    Based on the information set forth in this Affidavit, I
believe that probable cause exists to believe that a search of
the Target Telephones will produce some, if not all of the items
described in Attachment A hereto.

GEORGE MacLAUGHLIN
Task Force Agent
Drug Enforcement Administration


Sworn and subscribed to before me at Boston, Massachusetts,
this 25th day of March, 2004.

JUDITH G. DEIN
United States Magistrate Judge

-7-