```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA     )
                             )
v.                           )    CRIMINAL NO. 04-CR-10099-GAO
                             )
RYAN CARTER                  )
        Defendant            )
```

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS FRUITS OF ILLEGAL ARREST**

Now comes the United States, by its attorneys, Michael J. Sullivan, United States Attorney, and David G. Tobin, Assistant U.S. Attorney, and hereby move this Honorable Court to deny defendant's Motion to Suppress Fruits of Illegal Arrest. The defendant asserts essentially three grounds for suppression in his motion. First, the defendant argues that law enforcement officers had no probable cause to arrest the defendant without a warrant and the fruits of that arrest should be suppressed. The defendant further argues that the application for the search warrant submitted by law enforcement officers failed to establish probable cause. Finally, the defendant argues that the affidavit submitted by officer MacLaughlin in support of the search warrant "omitted and misstated critical facts."

The United States asserts that probable cause existed to arrest the defendant and the fruits of that lawful arrest should be admitted into evidence. Moreover, the United States asserts

that the affidavit submitted in support of the search warrant established probable cause and did not omit or misstate critical facts. The defendant's Motion to Suppress is without merit and should be denied.

## FACTS

This incident stems from a car stop by the Boston Police Department Youth Violence Strike Force (YVSF) on Washington Street, Dorchester, MA. On the night of March 2, 2004, YVSF officers attempted to conduct a car stop of a sport utility vehicle that Marlon Straw ("Straw") was driving. Straw refused to pull over and led police on a high speed chase through a residential neighborhood. Eventually, the car stopped and, after a foot chase, Straw was taken into custody by law enforcement officers. In the meantime, Robert Hylton ("Hylton"), the passenger in the car, surrendered to police, stating, "It's weed in the car, it's weed!"

Law enforcement officers arrested Straw and Hylton and then obtained a state search warrant for the vehicle. During the execution of the search warrant, the officers discovered a loaded handgun, and approximately 108 pounds (55 kilograms) of marijuana inside a crate found in the rear of the vehicle. On the exterior of the crate, the officers noticed a shipping label indicating that the crate had been shipped from Los Angeles, California, by Charles Augment, to a shipping company named Forward Air in

Chelsea, Massachusetts.  The label also indicated that "Doreen Grant" was the "consignee," and that the crate was "4 of 4."  The label also contained the following number: "18276790."  This information reasonably led Boston Police Detective Robert Fratalia to believe that three additional crates had been shipped under the same number by the same customer.

Using the number on the label (18276790), which Detective Fratalia believed was a customer account number, he tracked the other three crates via the internet to an Airport Express warehouse in Revere, Massachusetts.  The three crates were addressed to James O'Malley, 12 Brookview Street, Dorchester, Massachusetts, telephone number 617-304-5942, and had been sent by Robert Gaynor of 8126 W. Imperial Highway, Lynwood, California, via GM Export. Based on this information, Detective Fratalia, Boston Police Sergeant Giliano, and Bureau of Alcohol, Tobacco, and Firearms ("ATF") Special Agent ("SA") Phil Ball established surveillance at Airport Express in Revere. The officers then contacted Task Force Agent ("TFA") MacLaughlin and TFA Monteiro of Task Force One of the Drug Enforcement Administration ("DEA") to request assistance.

### DEFENDANT'S ARREST

As TFAs Monteiro and MacLaughlin were en route to the Airport Express warehouse, they received a telephone call from Detective Fratalia who stated that the defendant had just arrived

with a U-Haul rental truck and was making preparations to pick-up the remaining three crates. Detective Fratalia stated that the defendant had signed for the crates using the name "Mark James"[1], and was about to load them into his rental truck.

When TFAs MacLaughlin and Monteiro arrived at the warehouse loading door they observed the defendant standing on the loading dock. The defendant was in the process of guiding a fork lift loaded with a shipping crate into the back of his open and running rental truck. Just before the crate was placed in the truck, Detective Fratalia approached the defendant, identified himself as a police officer, and took the defendant into custody. Detective Fratalia then advised the defendant of his Miranda warnings and the defendant stated that he understood his rights.

Initially, the defendant identified himself as "Noah Milloy", and produced a Massachusetts driver's license with that name.  At that point, the defendant was handcuffed and placed in a law enforcement vehicle while a Massachusetts State Police K-9 unit was requested. While the defendant and TFA MacLaughlin were waiting for the K-9 unit to arrive, the defendant asked, "what can I do to get out of this?" TFA responded by telling the defendant that he could help himself by telling the truth.

---

[1] Further investigation revealed that in August 2003 and February 2004, the defendant signed for seven other crates delivered to Airport Express using the names Mark James, Mark Jacob, and Mark Jones.

A short time later, Detective Fratalia and TFA Monteiro entered the vehicle in which the defendant sat. At that time, TFA Monteiro asked the defendant if he could inspect the defendant's cellular telephones. Although the defendant denied this request, TFA Monteiro informed him that any incoming calls displayed on the exterior screen of the telephone were in plain view and could thus be viewed by present law enforcement agents. The defendant stated that he understood[2].

A short time later, the K-9 unit arrived and two drug certified State Police canines positively alerted on the three crates the defendant had attempted to pick-up. At this point, the defendant stated, "thumbs up, that can't be good, don't tell me." TFA Monteiro then reminded the defendant about his Miranda warnings and further reminded the defendant that he could stop answering questions at any time. The defendant again stated that he understood.

Detective Fratalia and TFAs Monteiro and MacLaughlin then proceeded to interview the defendant. During this session of questioning, the defendant maintained that his name was "Noah Milloy". When asked why he signed for the crates using the name

---

[2]Note: Prior to speaking with the defendant regarding permission to inspect the phones, SA Ball showed TFA Monteiro the "recent calls" display of one of the defendant's telephones. The telephone's phone book remained untouched. The facts of this search were submitted in the affidavit in support of a subsequent search warrant application.

"Mark James", the defendant stated that "it's just a name I use." The defendant also indicated that a "Mr. O'Malley" had met him near Dudley Station and told him to pick-up the wooden crates at Airport Express and deliver them to the address on the boxes.

Later the defendant recanted his story, and admitted his true name. The defendant admitted that the phone number (617-304-5942) listed on the three crates corresponded to a telephone that he had stuffed between the seats in the back of the police vehicle.  The defendant stated that he had been given the phone by "Mr. O'Malley" the previous day, and had been instructed to use it only in relation to the pick-up of the crates. The defendant also stated that a friend named "Marlon" had driven him to rent the U-Haul truck used to pick up the three crates.

The defendant was then transported to Boston Police Station A-1 for booking. The three crates seized from the defendant were later determined to hold approximately 681 pounds (309 kilograms) of marijuana.

## ARGUMENT

### FORWARD AIR

As the defendant's memorandum makes clear, Detective Fratalia used what he mistakenly termed a "customer account number" located on the single crate seized from Hylton to identify the location of the three crates that were seized from the defendant. In fact, what Detective Fratalia mistakenly termed

a "customer account number" is actually called an "airbill number" by Forward Air. The practice of Forward Air is to give each customer a different "airbill number."[3] Separate customers would never have the same airbill number as shipping parties are provided with the "airbill number" by Forward Air through the freight forwarder. To illustrate this point, if X showed up at GM Import/Export in Los Angeles to ship a crate to Boston, and Y showed up at the same time to ship three crates to Boston, they would each be given a different airbill number. Therefore, contrary to the assertions in the defendant's memorandum, the same party shipped all four crates from GM Import/Export in Los Angeles.

## PROBABLE CAUSE EXISTED TO ARREST THE DEFENDANT

The defendant was arrested without a warrant by law enforcement officers. Law enforcement officers reasonably believed that the defendant was involved in a conspiracy to possess marijuana with intent to distribute. An arrest without a warrant need only be supported by probable cause. United States v. Watson, 423 U.S. 411, 417 (1976). Probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent

---

[3] On July 11, 2005, the undersigned attorney for the government spoke over the telephone with representatives of Forward Air. The undersigned was informed that each customer is given their own airbill number.

person would believe the suspect had committed or was committing a crime." United States v. Young, 105 F.3d 1, 6 (1st cir. 1997). Probable cause is described as a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996).

The Government contends that this is clearly an instance where the facts and circumstances provided probable cause for law enforcement to make a lawful arrest. At the time the defendant was taken into custody, the law enforcement agents made a common sense determination based on the facts reasonably known to them. Briefly, on March 2, 2004, Boston Police officers arrested two men, Straw and Hylton, with a crate containing a substantial amount of Marijuana (108 pounds). On the crate was a label that stated that the crate was one of four shipped from Los Angeles to Boston under the same Forward Air airbill number. Detective Fratalia used the airbill number to locate the remaining three crates in Revere, Massachusetts, at Airport Express. Upon arriving at Airport Express, law enforcement observed the defendant arrive in a U-Haul to pick-up three crates similar in size and shape to the crate seized the previous day from Straw and Hylton. All four of the crates had the same airbill number. These facts taken together provided the law enforcement officers

with the probable cause needed to arrest the defendant.

The defendant argues that "the fact that all four crates were consolidated into a common shipment by the freight carrier did not assure that the remaining three contained contraband." However, complete assurance is not the standard used to determine probable cause. As stated above, probable cause "is a fluid concept – turning on the assessment of probabilities in particular factual contexts- not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). As probable cause is a matter of probabilities in particular factual contexts, rather than certain truths, in this factual context the facts clearly gave law enforcement officers probable cause to arrest the defendant. When one crate out of a shipment of four was found to contain a substantial amount of marijuana, it was reasonable for an experienced narcotics officer to assume that the three other crates in the same shipment, all shipped from the same customer, and all of similar size, would probably contain marijuana.

The cases relied upon by the defendant in his memorandum are distinguishable from this case. The defendant's memorandum quotes the Supreme Court's statement that, "in the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person ... nor may the police seek to verify their suspicions by means that approach

the conditions of arrest." Florida v. Royer, 460 U.S. 491, 499(1983). However, the context of this statement is important, as the above quote is taken from the Supreme Court's discussion of the "limited exceptions to the general rule that seizures of the person require probable cause to arrest." Id. at 499. In the present case, law enforcement agents had probable cause to arrest the defendant, making the exception quoted in the defendant's memorandum irrelevant.

The defendant's memorandum also cites United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998). In Acosta-Colon a canine alerted to the presence of narcotics in four checked suitcases at an airport. The suitcases bore tags with the names Miguel Morales and Jesus Lebron. Customs agents obtained the airline's computer record of reservations, which showed that the men had checked two bags each and which also indicated that two other persons, Carlos Acosta and Noel Traaveiso, were "connected with the reservations" of Morales and Lebron. As the Court states, "the governmental objective [in Acosta-Colon]... was to investigate a possible drug trafficking offense – more specifically, to confirm or dispel a suspicion that Acosta had a connection with certain luggage believed to contain narcotics." 157 F.3d at 16.

The present case is distinguishable from Acosta-Colon for a number of reasons. First, in Acosta-Colon the contraband was

found in the bags of two other men. There is no mention of Carlos Acosta checking any bags himself. Acosta was attached merely to the flight reservation, rather than the contraband luggage. As Acosta was not tied to the luggage specifically, no probable cause existed to arrest him. However, the facts are substantially different in the present case. Here, the three crates the defendant attempted to pick up in Revere on March 3, 2004, were directly connected by an airbill tracking number to a crate containing 108 pounds of Marijuana seized in Dorchester the previous night. Moreover, in <u>Acosta</u> there was no evidence at the time the defendant was taken into custody that he had any direct connection to the contraband luggage. Rather, Acosta's ties were only to the ticket reservations. In the present case, the defendant was in the process of loading one of the three crates into a running U-haul truck that he had rented. Thus, unlike the facts of <u>Acosta-Colon</u>, in the present case, law enforcement agents had unmistakable evidence that the defendant was directly tied to the three narcotics-filled crates. Officers witnessed first-hand the defendant as he attempted to load three of the four crates from airbill number 18276790 into his U-haul truck. As probability, rather than certainty, is the standard by which probable cause is measured, it is clear that in the present case law enforcement made a valid arrest of the defendant.

    The defendant also argues that the evidence obtained from

law enforcement's search of the "digital memory" of the defendant's cellular phone should be suppressed. This argument fails due to the rule of inevitable discovery. The Government contends that the law enforcement agents present at the defendant's arrest had probable cause to search the seized cell phones and crates that was independent of any information that TFA Monterio learned from his search of the defendant's "personal" cell phone. The inevitable discovery rule, as adopted by the Supreme Court in <u>Nix v. Williams</u>, 467 U.S. 431 (1984) provides for the admissibility of evidence discovered during a warrantless search if the evidence would have been inevitably discovered by law enforcement through independent legal means. <u>Id.</u> at 444. The First Circuit suggests that "the analysis focus on questions of independence [of the legal means of discovery] and inevitability and be flexible enough to handle many different fact patterns which will be presented." <u>United States v. Ford</u>, 22 F.3d 374 (1st Cir. 1994). In the present case, law enforcement had probable cause to take the defendant into custody when the arguably illegal search of his phone took place. Thus, although the initial search of the defendant's cell phone was arguably illegal, independent legal means of discovery of the cell phones recent calls list do exist.

As probable cause existed to arrest the defendant, the defendant's motion to suppress should be denied.

## THE DEFENDANT'S ARREST WAS LEGAL AND ALL FRUITS OF THE ARREST SHOULD BE ADMITTED AS EVIDENCE

The defendant's second contention is that the detention of the three crates was the fruit of unlawful arrest. This argument fails for two reasons. First, the defendant's arrest was based on probable cause and therefore was legal. Second, law enforcement had sufficient basis to seize the crates independent of the defendant's arrest.

First, the defendant's argument regarding the fruits of an illegal arrest fails because the arrest of the defendant was supported by probable cause. As explained above, law enforcement possessed clear evidence that the three crates located in Revere would in all probability contain narcotics. For this reason, the defendant's argument must fail.

Second, even assuming *arguendo* that the court finds the arrest of the defendant unsupported by probable cause, the defendant's argument still fails with regards to the crates. The three crates from airbill number 18276790 were not the fruits of the defendant's arrest. Law enforcement possessed enough evidence, separate and apart from the defendant's arrest, to obtain a search warrant for the crates.

## THE APPLICATION FOR THE SEARCH WARRANT ESTABLISHED PROBABLE CAUSE

13

The defendant next argues that the application for the search warrant contained insufficient information to establish probable cause. The defendant contends that the warrant application should have elaborated on the qualifications and experience of the dogsin question. However, this argument fails as courts have consistently held that it is unnecessary that an application for a search warrant contain the history of a drug dog's reliability.

In the present case, upon the defendant's arrival at Airport Express, he was detained and narcotics dogs were called for. A short time thereafter, two narcotics dogs, "Hooch" and "Thor", were brought to the Airport Express warehouse. Subsequently, the dogs both alerted to the presence of narcotics in the three crates remaining from airbill 18276790. As the First Circuit held, "the existence of probable cause based on an alert by a drug dog depends on the dog's reliability." United States v. Owen, 167 F.3d 739, 749 (1st Cir. 1993). In the present case, records provided to the defendant's counsel indicate that both Hooch and Thor have completed extensive training in narcotics detection.

The narcotics dog "Hooch" has a successful and extensive documented history of detecting narcotics throughout Massachusetts. Hooch has also completed the NESPAC Patrol/Utility Dog Course in November of 2003, which involved 400 hours of

14

training and has participated in hundreds of hours of narcotics investigation. Similarly, records provided to defendant's counsel indicate that the narcotics dog Thor has been certified in narcotics detection by the State Police Academy Canine Section since 2001 and in 2003 completed the 400 hour training requirement for a renewed narcotics detection certification. Records also indicate that Thor has participated in hundreds of successful narcotics investigations throughout Massachusetts.

The defendant's memorandum contends that there must be a showing of the dogs reliability on the face of the search warrant application to support probable cause. The defendant supports this contention with reference to United States v. Kennedy, 131 F.3d 1371, 1376-1377 (10th Cir. 1997). In Kennedy, the Tenth Circuit stated, "we decline to encumber the affidavit process by requiring affiants to include a complete history of a drug dog's reliability." Id. at 1377. Thus, despite the defendant's suggestion that an application for a search warrant need contain a detailed list of a dog's qualifications and experiences, the majority of the Circuit Courts require much less specificity. *See* United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996)(search warrant application need not describe the particulars of a dog's training, reference to dog as a "drug sniffing or drug detecting dog" sufficient to support probable cause), United States v. Venema, 563 F.2d 1003 (10th Cir. 1977); United States v. Daniel

15

982 f.2d 146, 151 (5th Cir. 1993).

In light of the applicable case law, the Government argues that TFA MacLaughlin's statement that "*a narcotics dog* was brought to scene," clearly meets the prevailing standard for information that need be included in an affidavit. The Government argues that a common sense reading of this statement, will lead one to the conclusion that a "narcotics dog" is a dog expertly trained in the detection of narcotics. This conclusion is supported by the reasoning of the First Circuit in <u>United States v. Meyer</u>, 536 F.2d 963 (1st Cir. 1976). In <u>Meyer</u>, the defendants were convicted of conspiracy to import a controlled substance after a narcotics dog alerted to drugs in their cruise ship stateroom. The defendants appealed and cited as grounds a statement in the Government's affidavit in support of the search warrant that a "trained dog" had assisted the DEA in searching the defendants' room. <u>Id.</u> at 965. The defendants argued that the words "trained dog" in the affidavit failed to sufficiently describe the dog's proficiency in the detection of narcotics. <u>Id.</u> at 966. In affirming both of the defendants' convictions, the First Circuit held that, "a magistrate's determination of probable cause is based on a common sense and realistic reading of the entire affidavit ... the magistrate could reasonably infer that the "trained dog" had a high degree of proficiency in detecting narcotics." <u>Id.</u> at 966. Similarly, in the present case,

a common sense reading of the term "narcotics dog" in the context of TFA MacLaughlin's entire affidavit would lead one to conclude that both dogs in question posses a high degree of proficiency in the detection of narcotics. As the records show, this was the true of both dogs that assisted in the investigation of the three crates at Airport Express.

In light of the relevant case law, TFA MacLaughlin's affidavit submitted in support of the search warrant is clearly sufficient with regards to the drug detection dogs. Therefore, the defendant's Motion to Suppress should be denied.

### THE SEARCH WARRANT APPLICATION WAS SUBMITTED IN GOOD FAITH AND MISSTATED ONLY MINOR FACTS

The defendant argues in his Memorandum in Support of Motion to Suppress that the affidavit submitted by TFA MacLaughlin misstated critical facts. In support of this notion the defendant cites Franks v. Delaware, 438, U.S. 154, 155-6 (1978).

> "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

First, the defendant specifically cites TFA MacLaughlin's mistaken use of the terms "the same customer" and the "same customer account number" when referring to the airbill number. Although the defendant characterizes this error as critical, it

was in fact only a minor semantic misstatement. As stated previously, TFA MacLaughlin's statement in the affidavit that the four packages had been shipped from the "same customer" was correct. As each customer at Forward Air is given a distinct airbill number, TFA MacLaughlin was correct in his assertion that all four crates were shipped by the "same customer", despite the different sender information written on one of the four crates. TFA MacLaughlin's later reference to the "airbill number" as a "customer account number" was similarly a trivial misstatement made in good faith. All freight shippers have different names for their respective tracking methods, Detective Fratalia mistakenly informed TFA MacLaughlin that he had located the remaining three crates from airbill 18276790 using a "customer account number" rather than an "airbill number". There is no evidence or suggestion in the record that TFA MacLaughlin either intentionally or recklessly misled the court.  This semantic error could not change the finding of probable cause in the present case, as such no hearing is necessary under <u>Franks</u>.

    Finally, the defendant's memorandum mentions what it labels as "The Mystery of the Dogs." The defendant contends that as the record is unclear about whether two dogs alerted to the presence of narcotics, or only one, a <u>Franks</u> hearing is necessary. Although the defendant's memorandum implies that perhaps one of the narcotics dogs failed to alert to the presence of narcotics

inside the crates, there is absolutely no support for this in the record. There is no "mystery of the dogs", two dogs trained in the detection of narcotics were brought to the Airport Express on the morning of March 3, 2004. Admittedly, TFA MacLaughlin's affidavit states that "a narcotics dog was brought to the scene." However, this misstatement is a minor one and certainly would not change the calculus with regards to probable cause. Enough evidence existed in the remaining pages of the affidavit to justify probable cause regardless of whether two dogs were used and only one mentioned. What is more important is that there is no showing by the defendant, or even suggestion in the record, that TFA MacLaughlin's statement was made either intentionally or with reckless disregard for the truth. As such, the defendant's request for a <u>Franks</u> hearing should be denied.

## CONCLUSION

The United States respectfully requests that the Court deny the defendant's Motion to the Suppress Fruits of Illegal Arrest and requests an evidentiary hearing.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: */s/ David G. Tobin*
DAVID G. TOBIN
Assistant U.S. Attorney

Dated:   August 3, 2005