UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA            )
                                    )
            v.                      )    CRIMINAL NO. 04-10099-GAO
                                    )
RYAN CARTER                         )

DEFENDANT'S POST-HEARING MEMORANDUM
IN SUPPORT OF MOTION TO SUPPRESS

Defendant Ryan Carter respectfully submits this post-hearing memorandum in support of his motion to suppress.

Proposed Findings of Fact

1.  On March 2, 2004, Boston Police stopped a vehicle in Dorchester, Massachusetts which contained a crate ("Dorchester crate").  Tr.1.8.[1]  Boston Police applied for a search warrant to open the crate.  A quantity of marijuana was found.

2.  Affixed to the Dorchester crate was a label identifying the shipper (GM Import Export of Gardena, CA), the recipient (Doreen Grant of Hyde Park, MA), the transporter (Forward Air), and #18276790.  See Government Exh. 3.  The number 4 also appeared (although not the "4 of 4" entry that Det. Robert Fratalia first testified to.  Compare Tr.1.10 with Tr.2.4).

3.  Det. Fratalia went online and accessed the webpage for Forward Air, Inc.  Defendant Exh. 1 and 2; Tr.1.11, 2.4.

---

[1]Transcripts of hearings in this matter are referenced as follows: October 19 ("Tr.1._); and October 20 (Tr.2._).

According to the webpage, Forward Air receives air freight from
freight forwarders and transports it by truck it to terminals
located near airports in the U.S. and Canada.  Dft. Exh. 2.
Fratalia "typed the air bill number into a block [on the webpage]
that says 'air bill' on it."  Tr.2.6.  He printed out the summary
relating to the airbill number, part of which is missing, see
Gvt. Ex. 2, which stated that the airbill included 4 pieces
delivered to Boston.

4.   Det. Fratalia testified that an airbill is a "document
that shows a shipper and a receiver," and lists weight and number
of packages.  Tr.1.34.  He did not recall reading the Forward Air
webpage which, among other things, stated that "[s]hipments
received at each terminal facility are consolidated and
transported by truck through the Company's network to the
terminal nearest the freight's ultimate destination."  Defendant
Exh. 2, Tr.2.7-9.  On March 5, 2004, Fratalia "printed out the
front page of the Forward Air internet site."  Tr.2.5; Dft. Ex.1.

5.   Det. Fratalia, accompanied by two other officers (Sgt.
Guiliano and ATF S/A Phil Ball), went the Forward Air office in
Chelsea (Tr.1.11).  Fratalia received a copy of a document headed
"Forward Air, Inc. Airfreight Waybill Number 18276790."  Dft.
Exh. 3, Tr.2.10.  When asked at the hearing whether Forward Air
had given him a copy of the airbill, he said: "You would have to
show me what the Forward Air air bill is, sir.  I'm not sure what

that is."  Tr.2.10.  Later, he said "this is all new to me, this whole setup."  Tr.2.14.  The airbill, admitted as Dft. Exh. 3, on its face was an agreement between the shipper (GM Import Export) and the transport company (Forward Air) to deliver four crates to a specific location (Airport Express).  Tr.2.14-15.  It listed four crates with a combined weight of 1313 lbs. and bore 2 handwritten references:  "#790" and "#791."  Tr.2.16.  The airbill did not name the original customer(s) or the ultimate recipient(s).  Tr.2.15.

6.  Det. Fratalia was told that the three crates were at the Airport Express warehouse at 250 Lee Burbank Highway, Revere, MA. Airport Express, Inc. is a terminal with a single loading dock which permits pick-up of interstate shipments.  Tr.2.31. Fratalia and his two fellow officers went to the office and waited until it opened.  At about 7:20 a.m., they spoke with Airport Express personnel, and were shown the crates.  Tr.2.17. They also received two documents which had been faxed from GM Import Export on March 1, 2004, which notified Airport Express of the shipment.  Tr.2.18.  One of the documents pertained to the Dorchester crate, identifying the shipper as Charles Augment of Paramount, CA and the consignee as Doreen Grant of Hyde Park, MA, and bore the HAWB# 791.  Def. Exh. 6.  The second identified the shipper as Robert Gaynor of Lynwood, CA and the consignee as

James O'Malley of Dorchester, MA, and bore the HAWB#791.  Dft. Exh. 5.

7.  Det. Fratalia did not ask representatives of Airport Express the meaning of "HAWB" or why both the airbill and the dispatch notices listed two HAWB numbers, 790 and 791.  Tr.2.20-21.  Fratalia testified that "I was never interested in what the HAWB number was."  Tr.2.22.  He did acknowledge in his testimony that "[t]here are also two different batches that are identified on the number, 790 and 791...."  Tr.2.46.  Off. MacLaughlin testified that he believed he was told that HAWB was House Air Way Bill.  Tr.2.78.

8.  Off. MacLaughlin also testified that TFA Montilla at some point gave him the separate receipt of GM Import Export for the three crates reflected in Dft. Exh. 5.  See Dft. Exh. 4; Tr.2.80.  The document had been provided by Airport Express to the officers at some time prior to the application for the search warrant.  Tr.2.81

9.  When Fratalia, Guiliano and Ball saw the crates, they did not call for a canine to come to the warehouse.  Tr.2.18.

10.  Det. Fratalia and his two fellow officers "just waited" to see if anyone would show up to pick up the crates.  Tr.1.13; 2.24.  Det. Fratalia was in contact with two other officers, Task Force Agent George MacLaughlin, a Milton Police officer, and Task Force Officer Montillo, who were en route.  Tr.2.63.

-4-

11.  "At approximately 8:00 a.m." defendant arrived at Airport Express, driving a truck. Affidavit of George MacLaughlin, Dft. Exh. 7; Tr.2.24.  Police watched as he signed the receipt form.  As defendant awaited the loading of the crates onto the truck, Det. Fratalia "intervened, identified [himself as a police officer], pulled Mr. Carter aside and put handcuffs on him, and took him into custody."  Tr.1.16.  Both Officer MacLaughlin and TFA Montilla were arriving as defendant was being arrested and handcuffed.  Tr.1.17; 2.65.

12.  Det. Fratalia testified that he administered Miranda warnings to defendant, but said he "d[idn't] remember [defendant's] response."  Tr.2.56.  He said that defendant "was very distant, if you will.  He didn't really speak with me at all."  Id.  He further testified that Carter indicated that "he didn't want to speak with [officers] at all."  Tr.2.57.

Q.  Now, when did he first tell you that he didn't want to talk to you about the crates?

A.  [Fratalia]:  Probably right after I read him his rights.

Tr.2.60.  Fratalia understood that the questions he was asking were intended to incriminate defendant.  Tr.2.59.  He interpreted defendant's silence as he pressed him with questions ("I had asked him what are you doing here" What are you here to pick up? What's in the crates?") "to mean he don't [stet] want to talk about it."  Tr.2.65.  Fratalia left defendant.  He did not make a

-5-

note that defendant did not want to talk with officers.  Tr.2.61.

13.  Officers put defendant into a police car, handcuffed.
Tr.2.25, 27.  MacLaughlin and Monteiro entered the car and
"interviewed [defendant] about the contents of those crates."
Tr.1.17.  Det. Fratalia also got into the car.  Tr.2.25.  Police
asked defendant for permission to inspect defendant's cell phones
which were taken from him at arrest.  Tr.2.26.  Defendant
refused.  Id.  Monteiro told defendant that police had already
accessed the remote memory and found the name "Pepsi," the name
used by Dale Muir whom Fratalia knew to be a major marijuana
trafficker.  Tr.2.28.  This was, in Fratalia's view, a "nexus"
connecting defendant and "Pepsi."  Tr.2.29, 31.

14.  A canine arrived, but Fratalia was not sure who called
for the dog.  Tr.2.31.  Fratalia testified that he saw the dog
walking around the crates for 30 seconds, but saw no alert.
Tr.2.35-37.  He did not know the name of the dog or its handler.
Tr.2.33-4.  At the time, the crates were at the front edge of the
single loading dock at the building.  Tr.1.17-18, 2.31.  The
affidavit of Off. MacLaughlin related no details about the
alleged alert, or even the name of the canine.  (In contrast, the
affidavit submitted to support the search warrant for the
Dorchester crate set out the identity of the canine and a basis
to assess its reliability.  See Dft. Ex. 8-ID.)

15.  "[R]ight after that [the alleged dog inspection],"
police went into the surveillance car with defendant and
questioned him.  Tr.1.20.  MacLaughlin recorded the time as
11:11 a.m.  Tr.2.72.  Fratalia estimated that police spoke with
Carter "inside of an hour" before Carter was taken from the
Airport Express location, which was at 12:30 p.m.  Tr.2.39-40.
Since Carter was arrested shortly after he arrived at 8:00 a.m.
and the alleged canine alert occurred right before the second
questioning (11:11 a.m.), it appears that Carter was held
approximately 3 hours awaiting arrival of the canine.

16.  During the second questioning in the police vehicle,
defendant made statements about a man, McNally, and how he had
met him.  Tr.1.23-24.

17.  Officer MacLaughlin prepared an affidavit in support of
a search warrant to open the crates.  In preparing the affidavit,
he did not access the Forward Air website, nor did he ask
Fratalia about the airbill.  Tr.2.45.  He did not contact anyone
from Forward Air or GM Import Export to learn the significance of
the HAWB entry.  Tr.2.78.  He testified that his statement in his
search warrant affidavit that the crates came from the "same
customer" was "determined by the customer account number."
Tr.2.76.  At the time, Off. MacLaughlin had in hand the receipt
from GM Import Export, which related to the three crates but _not_
the Dorchester crate.

18.  After securing the search warrant, police opened the three crates, finding marijuana wrapped in plastic wrap, concealed within blue plastic tubs or barrels, held within cardboard boxes, all concealed within the crates.  Tr.2.74-75; Dft. Exh. 9 and 10.

ARGUMENT

A.  There Was No Probable Cause to Arrest Defendant

An arrest without a warrant must be supported by probable cause.  United States v. Watson, 423 U.S. 411, 417 (1976). Probable cause requires the government to show "that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994).  Since defendant was arrested without a warrant, the government has the burden of showing that the challenged police conduct was lawful.  United States v. Cruz Jimenez, 894 F.2d 1, 6 (1st Cir. 1990).

Police arrested defendant[2] relying on, as Det. Fratalia described it, "an account number of some sort on all four [crates]."  Tr.1.12-13.  The number was, in reality, an "airbill

---

[2]Det. Fratalia testified unequivocally that he arrested defendant: "He was arrested on the loading dock, yes."  Tr.1.18. "[I] identified myself as a police officer, pulled Mr. Carter aside and put handcuffs on him, and took him into custody." Tr.1.16.

number," assigned by Forward Air to track its shipment from "LAX" to the point of destination, Airport Express at "BOS." Dft. Exh. 3. It was not a "customer number" assigned by GM Import Export; indeed, police had in hand a copy of GM Import Export's contract of carriage with the sender of the 3 crates, Robert Gaynor, which did not include the Dorchester crate and did not list the airbill number. Dft. Exh. 4. Thus, as police contemplated the arrest of the man on the loading dock, they had a contract for shipment of the three crates (Dft. Exh. 4), which did not include the Dorchester crate; they had a separate fax from GM Import Export corresponding to the three crates (Dft. Exh. 5) and a different fax for the Dorchester crate (Dft. Exh. 6); they knew that the weights of crates in the respective shipments were different (3 crates at 1144 lbs., see Dft. Exhs. 4 and 5; the Dorchester crate at 169 lbs., see Dft. Exh. 6); they knew that the senders and recipients were different (Robert Gaynor and James O'Malley, not Charles Augment and Doreen Grant); and knew that the separate faxes bore different HAWB #s.

Nonetheless, on the strength of a common "account number of some sort" and crates which looked alike, defendant was arrested. This did not constitute probable cause. In United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998), the government conceded that an airline reservations printout, which connected defendant to the reservations of persons carrying drugs, was insufficient

-9-

for probable cause.  In <u>United States v. Ceballos</u>, 654 F.2d 177,
179-180 (2nd Cir. 1981), where defendant was "completely unknown
to the officers," <u>id</u>. at 184, the court found no probable cause
to justify the arrest of the defendant in his car and the search
of a paper bag, where defendant had exited a building known to be
the residence of a drug dealer after a brief visit, carried a
paper bag and looked up and down street "in a curious manner"
before driving off.  <u>Id</u>. at 179.  In <u>United States v. Ingrao</u>, 897
F.2d 860, 863 (7th Cir. 1990), the court found that police lacked
probable cause to arrest the defendant after he was seen carrying
a bag down a gangway leading to a known trafficker's home.  The
court stated that, "without more, it cannot legally raise
suspicion concerning Ingrao."  The agents had never seen Ingrao
engage in illegal activity, had no information regarding him, and
had not recognized him.  <u>Id</u>. at 863-64.  In <u>United States v.
Anderson</u>, 981 F.2d 1560, 1566 (10th Cir. 1992), the court
reversed the denial of a motion to suppress, ruling that probable
cause was lacking for the arrest of a defendant who had driven a
pick-up truck from the home of a suspected drug dealer, and who
was later seen leaving the home on foot near the time of the
arrests of others.

    The police here went further, seizing defendant's phones and
probing the remote memory.  They found the name "Pepsi" in the
memory, which led Det. Fratalia to view defendant as being linked

to large scale marijuana trafficking.  Tr.2.29.  Discovery of
this "nexus," as Fratalia characterized the link to "Pepsi,"
drove the continued custody of defendant and of the crates he had
come to claim.

A search incident to an arrest requires a prior valid
arrest.  See Smith v. Ohio, 494 U.S. 541, 543 (1990) (reasoning
that "[a]s we have had occasion in the past to observe, '[i]t is
axiomatic that an incident search may not precede an arrest and
serve as part of its justification," citing Sibron v. New York,
392 U.S. 40, 63 (1968)).  As the Court put it in Florida v.
Royer:  "In the name of investigating a person who is no more
than suspected of criminal activity, the police may not carry out
a full search of the person ... or other effects .... Nor may the
police seek to verify their suspicions by means that approach the
conditions of an arrest."  Florida v. Royer, 460 U.S. 491, 499
(1983).  Here, the conditions were arrest and police maintained
custody of defendant and of the crates to further their
investigation.

On redirect at the hearing, Det. Fratalia testified that he
was motivated to arrest defendant by a concern for his personal
safety.  Tr.2.61-65.  This was a newly minted claim, offered to
justify an arrest unsupported by probable cause.  While a concern
for personal safety can, but not always, justify a frisk incident
to a lawful Terry stop, see United States v. McCoy, slip op.,

-11-

2005 Lexis 23555 (1st Cir. November 1, 2005), it surely does not
suffice to establish probable cause to arrest.  In any event,
Det. Fratalia was not alone at Airport Express, where he was
accompanied by Sgt. Guiliano and TFA Ball, all of whom were
staked out "just wait[ing]" to see who would show up to claim the
three crates.  Tr.1.13.  When a lone man in a truck arrived,
Fratalia advanced to arrest him, just as two additional officers
were driving up (MacLaughlin and Montilla).  Det. Fratalia's
claim of concern for safety, when he was supported by four
officers, is unpersuasive.

    The remedy for a warrantless arrest without probable cause
is well settled:  "if an arrest is not based on probable cause,
then statements and evidence obtained as a result of the arrest
are inadmissible."  United States v. Fiasconao, 315 F.3d 28, 34
(1st Cir. 2002).  All statements taken in the wake of the illegal
arrest must be suppressed.  See Brown v. Illinois, 422 U.S. 590,
601-02 (1975) (defendant's statement, separated from his illegal
arrest by less than two hours, suppressed under Wong Sun); Wong
Sun v. United States, 371 U.S. 471, 484-86 (1963); United States
v. Jorge, 865 F.2d 6, 9-10 (1st Cir. 1989).  The fruits of
defendant's unlawful arrest also include the seizures of property
on his person, and the information obtained from accessing the
remote memory of his phones, particularly the alleged link to
"Pepsi."  The "Pepsi" discovery was followed by a request for a

canine to arrive, making the canine examination a fruit of the unlawful arrest.

B.   Police Interrogated Defendant in Violation of Miranda

Defendant's statements, in addition to being fruits of an unlawful arrest, were also obtained in violation of the Fifth Amendment.  Under Miranda, "[i]f an individual indicates in any manner ... that he wishes to remain silent, the interrogation must cease."  Miranda v. Arizona, 384 U.S. 436, 473-4 (1966). See McGraw v. Holland, 257 F.3d 513, 515 (6th Cir. 2001) (continued questioning violated Miranda after defendant said I don't want to talk about it).  At the hearing, Det. Fratalia testified that he remembered administering Miranda warnings to defendant, but that he "d[idn't] remember [defendant's] response."  Tr.2.56.  One might think that defendant's response to the warnings would stand out (and not that warnings were intoned), particularly where defendant repeatedly refused to respond to Fratalia's questions.  Fratalia made no written note of defendant's response, but he acknowledged its import. Defendant "was very distant, if you will.  He didn't really speak with me at all," id., and "didn't want to speak with [officers] at all."  Tr.2.57.  Defendant's response, however, was not merely silence in the face of questioning by Fratalia; defendant said that he did not want to talk with police:

> Q.  Now, when did he first tell you that he didn't want
> to talk to you about the crates?

    A. [Fratalia]:  Probably right after I read him his
    rights.

Tr.2.60.   Fratalia elected not to write this down:

    Q.  Did you write down that he said he did not want to
    talk to you about the crates?

    A. [Fratalia]: No, I did not, no.

Tr.2.61.  Fratalia and his fellow officers then proceeded to

question defendant, asking him for permission to access his cell

phone's memory.  Defendant denied the request, an act entirely

consistent with his invocation of silence.  Police approached him

a second time, after the alleged canine alert, while he was still

handcuffed in the police vehicle.  This questioning, too,

violated the Fifth Amendment.

    In certain circumstances, invocation of the right to silence

does not preclude police questioning at a later time.  In

Michigan v. Mosley, 423 U.S. 96, 104 (1975), the Court held that

"the admissibility of statements obtained after the person in

custody has decided to remain silent depends under Miranda on

whether his 'right to cut off questioning' was scrupulously

honored."  Id. at 104 (footnote omitted).  In Mosley, the Supreme

Court reversed a suppression order where, more than two hours

after asserting his right to remain silent, the defendant was

questioned "by another police officer at another location about

an unrelated holdup murder." Id.  Before being questioned again,

Mosley was read his rights a second time.  Thus, the police had

"immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." <u>Id</u>. at 106.

The First Circuit has interpreted <u>Mosley</u> as requiring courts to "consider, inter alia, the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence." <u>United States v. Barone</u>, 968 F.2d 1378, 1384 (1st Cir. 1992) (affirming suppression of statements made after police four times tried to reinitiate interrogation after assertion of rights, failed to provide "full Miranda warnings" on those occasions, and obtained statements more than 24 hours after right to remain silent asserted).

Here, defendant was held in the rear of a police vehicle, handcuffed in place since approximately 8:00 a.m.  At about 11:11 a.m., after the alleged dog alert, police again entered the car and questioned defendant, without fresh warnings, and pressing questions about the same subject matter as before.  Each of these alleged statements must be suppressed in light of <u>Michigan v. Mosley</u>.

Defendant's statements, unlawfully taken, were then used to secure the search warrant. The affidavit of Off. MacLaughlin included allegations that defendant in his post-arrest statements had several times lied to investigative agents. The affidavit said that officers had found in the remote memory of Carter's phone an entry for the telephone number found on a shipping label and that Carter had lied about that number. It further alleged that Carter said that he had been given the phone by a Hispanic male named O'Malley, and that he "expected to be paid $400 to $500" for delivering the crates. See Affidavit, Dft. Exh. 7 at 5-6. These allegations in the search warrant were the unlawful fruit of the violation of the Fifth Amendment.

C.  The Delay Awaiting the Canine Sniff Was Unreasonable

Defendant submits that the use of a canine was a fruit of the unlawful arrest, as the dog was summoned following defendant's arrest and after the seizure and illegal penetration into the memory of his phone. He further submits that the delay awaiting the canine sniff was unreasonable.

Police first viewed the three crates at Airport Express at about 7:20 a.m. They did not call for a canine (notwithstanding having used a canine the prior evening in the examination of the Dorchester crate, see Dft. Exh. 4-ID). After arresting defendant at about 8:00 a.m., they held him for several hours, handcuffed in the rear of a police vehicle. In the interim, police

discovered the "nexus" between defendant and "Pepsi," after accessing the phone's memory bank.  At some point, although Det. Fratalia could not say when or by whom, a canine was summoned. Defendant continued to be held, as were the crates, awaiting the arrival of the dog.  The ensuing delay, timed from defendant's arrest at approximately 8:00 a.m., approximated three hours.

In United States v. Place, 462 U.S. 696 (1983), the Supreme Court held that a 90 minute delay while awaiting a canine to sniff the suitcase of a traveler at an airport was unreasonable under the Fourth Amendment.  In Place, the defendant was not arrested.  Police permitted him to go on his way as they took the luggage for a canine sniff.  The Court noted:

> The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained.

Id. at 708.

Unlike in Place, defendant here was subjected to custodial confinement. In Place, the Court held that "the brevity of the invasion of the individual's Fourth Amendment interests" was an important factor in evaluating the seizure, and held that the detention of a traveler's property alone, and not his person, could not be justified for the "prolonged 90-minute period."  Id. at 710.  If a non-custodial seizure of property was unduly long

-17-

at 90 minutes, the tolerable period here where defendant was under arrest was certainly shorter.

Importantly, Place rejected the argument that a detention under Terry of a person's luggage should be evaluated differently, or allowed to continue for a longer period, than seizure of the person himself.  Place also insisted that police must proceed diligently to arrange a dog sniff, and faulted them for not anticipating the need for a dog to "minimize[] the intrusion on respondent's Fourth Amendment interests."  Here too, police did not request a dog when they first viewed the crates at 7:20 a.m. and only secured a dog shortly before interviewing defendant a second time at 11:11 a.m.  In the interim, the crate (and defendant too) was detained in the absence of probable cause.  See also United States v. Acosta-Colon, supra ("an investigatory detention of close to 30 minutes -- particularly one that interferes with an individual's "liberty interest in proceeding with his itinerary," Place, 462 U.S. 696 at 708 -- is hardly a trivially intrusive affair."); United States v. $191,910 in U.S. Currency, 16 F.3d 1051 (9th Cir. 1994) (2 hours awaiting dog sniff too long); United States v. Cagle, 849 F.2d 924 (5th Cir. 1988) (90 minutes too long);  United States v. Sugar, 322 F.Supp.2d 85 (D.Mass. 2004) (10-15 minute stop of motorist to enable a canine sniff was unreasonable); United States v. Dortch, 199 F.3d 193 (5th Cir. 1999) (10-15 minute

detention of motorist to bring in drug dog was unreasonable).

Cf. United States v. West, 731 F.2d 90, 91-92 (1st Cir. 1984) (45

to 60 minutes did not violate Place, where defendant was not

detained and had departed).

Place made clear that detention of property in a traveler's

possession, if justifiable on reasonable suspicion, must be for a

short time, certainly less than 90 minutes, and be "minimally

intrusive."  This same rule applies here, where defendant was

claiming an interstate shipment and had a truck poised to move

it.[3]  A crate claimed on a loading dock is identical in

constitutional kind to a suitcase claimed from an airport

carousel.  In both instances, if supported by reasonable

suspicion, police must act expeditiously to complete their

investigation, whether to get a canine, as here or in Place, or

to complete other investigatory measures, so as not to interfere

---

[3] This case differs, as did Place, from cases where the property
was en route to a destination, and not being picked up or
possessed by a person.  In such pure-property cases, a
defendant's "liberty interest in proceeding with his intinerary,"
Place, 462 U.S. at 708, is not implicated.  Thus, in United
States v. LaFrance, 879 F.2d 1 (1st Cir. 1989), for example, a
Fed Ex package was identified in transit and held for inspection
for several hours pending a dog sniff.  The court ruled that the
detention of the package was not unreasonable, noting that
"appellees have pointed to no liberty interest accompanying their
possessory interest. While the police are not free to dispossess
an individual at will, they are subject to fewer restraining
circumstances where they trammel no other recognized interest
apart from that of possession alone."  Id. at 6.

with transit by the person in possession of, or taking possession of, the object or objects.  Id. at 709.

Here, police did not act expeditiously to secure a canine, and consistent with Place, suppression should be ordered.

D.   The Government Did Not Establish that the Canine Alerted

The government bore the burden of showing that probable cause existed for the arrest of defendant.  See United States v. Cruz Jimenez, 894 F.2d at 6.  Part of its burden was to establish that the canine alerted so as to justify defendant's continued custody, his transportation in custody from Airport Express at 12:30 p.m., and, ultimately the government's continued custody of the crates.  Yet the government offered no such evidence. Det. Fratalia testified that he saw a canine walking around the crates for 30 seconds, but saw no alert.  Tr.2.35-37.  He could not offer in his testimony either the name of the dog or of its handler.  Tr.2.33-4.  Bluntly, it tests one's credulity that Det. Fratalia, for several hours standing around a building with the crates resting at the edge of the single loading dock, did not eagerly await the dog's bark, scratch or howl, anything to make the case that marijuana was present within the crates.

The crates, once disassembled, contained redundant layers of concealment, presumably to protect the contents against detection by a canine.  The crates held plastic barrels which were concealed within cardboard boxes.  The marijuana itself was

wrapped in plastic.  There was substantial question, unanswered
by the government at the hearing, whether a canine could detect
marijuana within multiple layers of concealment.  All the Court
was offered was the testimony of Det. Fratalia that he saw the
dog walking around the crates for 30 seconds but saw no alert.
Tr.2.35-37.

Defendant submits that the government did not bear its
burden to demonstrate a canine alert, and, therefore, there was
no probable cause to detain the defendant or the crates.

E.  The Application for Search Warrant Omitted and
    Misstated Critical Facts, and Used the Fruits of an
    Unlawful Arrest

Eventually, police applied for a search warrant for the
crates.[4]  In the supporting affidavit, Off. MacLaughlin included
statements of defendant which had been elicited in violation of
the Fifth Amendment; he referred to an examination of defendant's
phone which had been probed without defendant's consent; and he
referred to a canine alert about which he offered not a single
descriptive particular.

The starting point in examining the affidavit, however, is

---

[4]In Rakas v. Illinois, 439 U.S. 128, 143-144 n.12 (1978),  the
Supreme Court stated that "one who owns or lawfully possesses or
controls property will in all likelihood have a legitimate
expectation of privacy by virtue of this right to exclude."
Here, defendant was claiming the crates and Airport Express was
preparing them for delivery to him, immediately prior to his
arrest.  This assertion of a lawful possessory claim establishes
his standing.

the allegation that the crates originated from the "same

customer." As set out the MacLaughlin Affidavit:

> Further investigation of the label revealed that the
> crate in question was one of four packages that had
> been shipped from the same customer in Los Angeles,
> California to a shipping company named Airport Express,
> Inc. located at 250 Lee Burbank Hwy., in Revere,
> Massachusetts. [emphasis added]

Affidavit at ¶ 4. As became abundantly clear during the hearing,

there was no "[f]urther investigation." Det. Fratalia did not

read the Forward Air website to learn the shipping practices of

the firm, particularly regarding Forward Air's announced practice

of consolidating shipments bound for a common location. Nor did

he or MacLaughlin call Forward Air or GM Import Export to inquire

about the airbill and its significance, or about the other

documents, before applying for the warrant. When asked at the

hearing whether Forward Air had given him a copy of the airbill,

Det. Fratalia said: "You would have to show me what the Forward

Air air bill is, sir. I'm not sure what that is." Tr.2.10.

Later, he said "this is all new to me, this whole setup." As

"new" as the shipping business may have been to Det. Fratalia, he

and his colleagues showed little interest in learning the

important particulars. Indeed, Det. Fratalia made it

unapologetically clear that he "was never interested in what the

HAWB number was." Tr.2.22. This was more than mere inattention

to the niceties of shipping or a tin ear to its distinctions.

Rather, it was a reckless disregard to the significance of an

airbill, casting it as a "customer account number" in the warrant affidavit, and as an "account number of some sort," as Det. Fratalia carelessly described it in his testimony before this Court.  The key assertion in the affidavit that the packages originated "from the same customer" was undermined by the GM Import Export contract for the 3 crates (Dft. Exh. 4), undermined by the faxes (Dft. Exh. 5 and 6), and unsupported in the Forward Air webpage, which nowhere characterized an airbill as a customer number, Tr.2.7.

The assertion that there had been a "[f]urther investigation" was baseless, serving only to mislead a judicial reader into believing that officers had done some legwork to support the claim that the four packages "had been shipped from the same customer in Los Angeles."  Treating the airbill number as a customer number, worse, averring that the crates were shipped "from the same customer," served to link the three crates with the seized Dorchester crate as coming from a common source, not just a common shipping route.  The "same customer" assertion was made to offset conspicuous differences between the seized Dorchester crate and the three crates awaiting delivery in Revere, namely that the three crates were sent by a different person, to a different end customer, and were picked up at different times by different persons.

-23-

Under <u>Franks v. Delaware</u>, 438 U.S. 154, 155-6 (1978), where "at [a] hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Here, the allegation that the "same customer" shipped the four crates must be "set to one side" as the product of, at minimum, reckless disregard. The allegations relating to statements made by defendant, too, must be set aside, as fruits of a violation of the Fifth Amendment and of an unlawful arrest. So, too, the allegation that the dog alerted, as the request for the dog was the product of an illegal search, and as the delay preceding the arrival of the dog was unreasonable.

Shorn of allegations recklessly made and of the fruits of an unlawful arrest of defendant and unlawful custody of the creates, the warrant fails to articulate any probable cause, and therefore the search under the warrant fails.

F. The Application for the Search Warrant Failed to
   <u>Establish Probable Cause</u>

The warrant application stated that "[a] narcotics dog" was brought to the scene and "alerted." Affidavit, ¶ 5, Dft. Exh. 7. "The existence of probable cause based on an alert by a drug dog

depends upon the dog's reliability.  See <u>United States v. Race</u>, 529 F.2d 12, 14 (1st Cir. 1976)." <u>United States v. Owens</u>, 167 F.3d 739, 749 (1st Cir. 1999).  Thus, in <u>United States v. Lingenfelter</u>, 997 F.2d 632 (9th Cir. 1993), the court, after noting that "the application for the warrant [must] establish[] the dog's reliability," stated that the submission to the magistrate included that the canine had "participated in approximately 300 hours of training searches, and that [the dog] has never given a false alert or failed to detect the drug and narcotic .... In all, [the dog] has performed approximately 500 investigations and has been successfully relied upon in the past to sniff out narcotics."  Even in the Tenth Circuit, where a lesser standard prevails, the allegation that "[a] narcotics dog" was used would be insufficient.  See <u>United States v. Kennedy</u>, 131 F.3d 1371, 1376-77 (10th Cir. 1997) ("As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics.")

Here, there was no allegation whether the unnamed dog was certified, nor was its training described.  There was no disclosure of its track record, nor of its record relating to false alerts, nor how it alerted here.  Since the dog alert drove the probable cause equation, it mattered a great deal what the dog did and whether that was reliable.  Here, akin to the

informant whose reliability was never affirmed, there was utter silence in the application to bolster the claim of a canine alert. See, e.g., United States v. Kolodziej, 712 F.2d 975, 977 (5th Cir. 1983) (where the affidavit failed to show basis of knowledge or reliability of informants, suppression order affirmed). In the case of an informant, a deficient showing of reliability may be overcome by a strong showing of basis of knowledge. See Illinois v. Gates, 462 U.S. 218, 233 (1983). But in the case of a dog, the entirety of the dog's probative offering lies in its spontaneous conduct (whether a bark, a rest or whatever else is alleged to constitute the "alert") and whether that conduct, because of the dog's training and reliability, meant something. Under this Circuit's Owens decision, there must be a showing of the dog's reliability to support probable cause and none appeared in the warrant.

<u>CONCLUSION</u>

For the reasons set forth above, defendant's arrest and the fruits of the unlawful arrest, including all statements and physical evidence, as well as the illegally detained crates, should be suppressed.

RYAN CARTER
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
    B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
November 4, 2005        Tel: 617-223-8061