UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION  NO. 04-10099-GAO

UNITED STATES OF AMERICA

v.

RYAN CARTER,
Defendant.

MEMORANDUM AND ORDER
February 8, 2006

O'TOOLE, D.J.

Ryan Carter is charged with knowingly and intentionally possessing marijuana with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1).  He was arrested without a warrant on the morning of March 3, 2004, when he arrived at the facility of a freight handling company in Revere, Massachusetts, to pick up three large wooden crates, believed then by police and later shown to contain marijuana.  Carter has moved to suppress the fruits of what he asserts was an illegal arrest. After consideration of the evidence presented by the parties at an evidentiary hearing on the motion, as well as their legal memoranda and arguments, I conclude that the defendant's motion ought to be GRANTED in all respects.

I.    Findings of Fact

In the evening of March 2, 2004, Boston police officers stopped a sport utility vehicle for speeding.  The full details of the encounter are not important here.  What is significant for the present motion is that the police found a shipping crate in the back of the vehicle that was discovered to contain marijuana.

The exterior of the crate had various labels affixed to it. One label had a printed heading with a company name, "GM Import Exports Corp." with a California address, telephone and fax numbers, and a web site address. Below the printed heading appeared the handwritten notation "BOS, Forward Air, # 18276790, 4/1313."

Boston Police Detective Robert Fratalia accessed the web site of Forward Air, Inc., a freight handling company, and entered the eight digit number from the label (18276790), which he believed to be an air bill number, into a tracking tool provided by the webpage. This yielded the information that four pieces with a weight of 1313 pounds had been shipped under that number to Boston's Logan Airport and had been delivered on March 1. The information about the number and weight of the pieces was consistent with the handwritten notation on the seized crate, "4/1313."

Fratalia and other officers went to the Forward Air facility in East Boston, where they were given a copy of the airfreight waybill # 18276790. The waybill indicated on its face that a shipping company from California, GM Import Exports, had sent 4 crates weighing 1313 pounds via Forward Air to a company called "Airport Express," listed as consignee. In what appeared to be instructions, the words "Hold & Notify" and two telephone numbers followed the identification of Airport Express as consignee. In a space on the form for "special instructions," there were written two numbers – # 790 and # 791.

From the Forward Air facility, the officers went in the early morning to the Airport Express warehouse in Revere, where they had been told the three crates that had been shipped with the one the police had seized the night before were being held for pickup. At the Airport Express facility, the officers received two additional documents that had been faxed from GM Import Exports on March 1, according to the fax line at the top of each document. Each advised that a shipment carried by

2

Forward Air would be arriving March 2 under airfreight waybill # 18276790 and that the shipment was to be held for pickup.  Beyond that, the information on each of the documents was different.

One, bearing the notation "HAWB # 791" identified the shipper as "Charles Augment, 15130 Indiana Ave, Paramount, CA 90723" and the consignee as "Doreen Grant, 82 Fairmont Ave, Hyde Park, MA 02136, Tel: 617-470-2144."  This document indicated that the shipment had 1 piece weighing 169 pounds.

The other document bore the notation "HAWB # 790" and identified the shipper as "Robert Gaynor, 8126 W. Imperial Hwy, Lynwood, CA 90262" and the consignee as "James O'Malley, 12 Brookview St, Dorchester, MA 02124, Tel: 617-304-5942."  This document indicated that the shipment included 3 pieces, weighing 1144 pounds.  It apparently pertained to the three crates still being held at the Airport Express warehouse, which the officers viewed.

The officers waited at the warehouse to see who would pick up the crates.  Within an hour or so after the facility opened for business, the defendant arrived in a rented U-Haul truck.  An employee of Airport Express told the police he recognized the defendant as someone who had picked up similar cargo in the past.  The defendant signed for the three crates, using the name "Mark James."  As one of the crates was about to be loaded into his truck, Fratalia arrested the defendant. The defendant was handcuffed.[1]  He was then placed in a police cruiser.

---

[1]  In his testimony, Fratalia avoided directly acknowledging that he had "arrested" the defendant, but he did agree that Carter was not free to leave.  Fratalia also said he put handcuffs on Carter out of concern for Fratalia's safety.  It is standard procedure for police to handcuff an arrestee, and perhaps what Fratalia meant to say was that, having arrested Carter, he handcuffed him pursuant to usual safe practice. To the extent the reference to safety was an effort at an alternate justification for Carter's detention, I reject it.

After placing Carter in custody, Fratalia advised him of his Miranda rights with respect to questioning. In response, according to Fratalia, Carter was "distant" and "didn't really speak with me at all." Although Carter initially gave Fratalia his name (an alias, it turns out), "he really didn't want to speak in terms of the contents of the packages." Nonetheless, other officers joined Fratalia in attempting to question Carter, and eventually he began to answer their questions. I find that Carter did not voluntarily waive his right not to answer questions, but rather eventually gave in to insistent and persistent questioning by the police in the absence of a voluntary waiver.

One of the other officers also took Carter's cell phone without his permission and examined its memory. He discovered an entry for "Pepsi," which the officers recognized as the nickname of a known marijuana distributor. This seemed to confirm for them that the defendant was involved in dealing in marijuana.

Eventually – the time is unclear, but it was perhaps as long as an hour or more after Carter was handcuffed – a drug-sniffing dog was brought to the warehouse. The government asserts that the dog "alerted" to the crates at issue, but the evidence was very unsatisfactory. Neither of the witnesses who testified himself saw any such "alert." Both indicated that they had been told by others of the alert. Based on the state of the evidence, I cannot find as a fact that the drug dog "alerted" to the crates.

One of the other task force officers applied for a search warrant to search the three crates. The affidavit included the information known to the officers about the shipping of the four crates from California, as well as information obtained from Carter and from his cell phone. The affidavit also asserted that the drug sniffing dog had alerted to the three crates at the Airport Express warehouse.

On the basis of the affidavit, a warrant was issued and the crates were searched. They contained marijuana.

II.    Rulings

A. *The Arrest of the Defendant Was Made without Probable Cause*

An arrest without a warrant must be supported by probable cause. United States v. Watson, 423 U.S. 411, 417 (1976). Probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

Carter was arrested because he was claiming possession of crates that the police suspected contained marijuana. Their principal reasons for thinking that the three crates at the Airport Express warehouse contained marijuana were (1) the crates were similar in size and appearance to the crate seized the previous evening that they knew contained marijuana and (2) the three crates had been shipped on the same airfreight waybill as the seized crate. In other words, they regarded the four crates to have been part of a single shipment and inferred that the three unopened crates likely contained the same thing – marijuana – as the opened one. Given the dimensions of the three unopened crates, the inference was a plausible, though not a necessary, one.

At the same time, the officers were aware of information that weakened that inference. The officers had seen shipping documents that distinguished between the one crate that had been seized the night before and the group of three found at Airport Express. The actual shipper and recipient (as opposed to the freight forwarders or carriers) named in these documents for the one crate were not the same as the shipper and recipient named for the other three. The relative weights were

5

different as well. The seized crate weighed 169 pounds, whereas the other three totaled 1144, averaging to over 380 pounds per crate. Moreover, while the crates were generally similar in size and appearance, they were not identical. From photographs offered in evidence, it appears that the seized crate had a kind of cardboard exterior surface, while the other three appear to have a plywood exterior. The single seized crate also had supporting wooden slats crossing the lateral surfaces of the crate, while the three others do not. The design of some of the labels affixed to the crates was also slightly different. For example, the seized crate had a "This End Up" label with a single broad red arrow indicating the direction; the other three had a label that displayed three parallel arrows of apparently different colors (the photo is in black and white). The difference in labels is suggestive of the possibility that they had been affixed by different persons, weakening the suggestion that they all had been treated as a single, four-piece shipment originating from the same source.[2] And, of course, there was the obvious fact that the seized crate had been treated differently in that it had already been picked up, suggesting that the ultimate recipients of the crates were indeed different people.

In sum, the police had some information that tended to support an inference that because the seized crate contained marijuana, its companion crates in the same shipment did as well. But they also had information that undermined such an inference and instead supported an inference that what they assumed was a group of four crates was actually two groups, a group of three crates and a group of one.

---

[2] If one were to apply to the four crates the children's game "Which of these things is not like the others?", it seems clear that the obviously correct answer would be that the already seized crate was sufficiently different from the other three to be the only satisfactory choice.

On this information, probable cause did not exist to believe the three unopened crates the defendant came to retrieve contained contraband. The information probably was sufficient to amount to an "articulable suspicion" that the crates contained marijuana so as to justify a "Terry-type" temporary detention of the defendant, but that suspicion would not justify an arrest. See Wong Sun v. United States, 371 U.S. 471, 479 (1963) ("[I]t is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion."). In any event, Carter was not merely temporarily detained; he was handcuffed and put in the cruiser, where he was joined by three law enforcement agents who proceeded to question him. Considering the totality of the circumstances, I find that, at a minimum, law enforcement's handling of Carter constituted a *de facto* arrest. See United States v. Acosta-Colon, 157 F.3d 9, 14-17 (1st Cir. 1998) (rejecting the government's argument that it had made an investigatory stop and finding *de facto* arrest where (1) suspect was handcuffed and taken to an interrogation room and (2) government "utterly failed to identify *specific facts* supporting its invocation of 'security reasons' as justification for [its handling of the defendant]") (emphasis in original).

If he had been merely detained under the authority of Terry, the detention exceeded what would have been proper to fulfill the legitimate purpose of such a stop. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) (observing that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"). See also United States v. Hornbecker, 316 F.3d 40 (1st Cir. 2003) (length of detention may affect reasonableness of Terry detention). Thus, it might be permissible under some circumstances to detain a person for a reasonable time to permit officers to see whether a drug sniffing dog would alert to the presence of contraband in the suspected crates. But an extended detention to await the arrival of the

7

dog, such as occurred here, cannot be justified under <u>Terry</u> principles. This would apply not only to the seizure of Carter's body, but also to the seizure of his goods, the three crates. <u>See</u> <u>United States</u> <u>v. Place</u>, 462 U.S. 696 (1983) ( <u>Terry</u> detention of luggage suspected of containing narcotics for one and one-half hours for purposes of conducting a canine sniff constituted an illegal seizure).

Because the defendant's arrest was made without a warrant and because it was not supported by probable cause, it was unlawful under the Fourth Amendment.

B. *The Defendant's Statements Were Illegally Obtained*

Since any statements made by the defendant were made after his unlawful arrest, they are fruits of the unlawful arrest and must be suppressed. <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975).

Moreover, the statements were plainly made during a custodial interrogation: Carter was handcuffed and seated within a police cruiser. Though he was advised of his <u>Miranda</u> rights, the evidence does not support a finding that he voluntarily waived those rights. Rather, the evidence was that he was unwilling to answer questions, and may even have said as much explicitly. Nonetheless, the police kept probing and, after finding some information on his cell phone (see below), finally induced him to talk to them. Carter's succumbing to continued pressure to provide information is not equivalent to a voluntary waiver of his rights. <u>See</u> <u>United States v. Barone</u>, 968 F.2d 1378, 1382-84 (1st Cir. 1992) (citing <u>Michigan v. Mosley</u>, 423 U.S. 96, 103-104 (1975), for the proposition that defendant's statements, even if found to be voluntary, must be suppressed where the defendant has invoked his Miranda right to cut off questioning and law enforcement has not "scrupulously honored" the exercise of that right); <u>cf.</u> <u>Schneckloth v. Bustamante</u>, 412 U.S. 218, 226 (1973) (stating that "in determining whether a defendant's will was overborne," the courts should

8

assess "the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation").   For this separate reason, his statements must be suppressed.

      C.   *The Search of the Defendant's Cell Phone Was Unlawful*

      After Carter was in custody, one of the officers took his cell phone and examined it for information stored in its memory.  One thing they learned was that Carter had the number for a person named "Pepsi," known to the officers to be a marijuana distributor.  The evidence resulting from the examination of the cell phone must be suppressed, for it occurred as a direct consequence of the illegal arrest.

      D.   *Stripped of the Fruits of Unlawful Conduct, the Affidavit Failed to Establish Probable Cause to Issue the Search Warrant*

      Task Force Agent George McLaughlin submitted an affidavit in support of his application for a warrant to search the three crates held at the Airport Express warehouse.  The affidavit contained and relied on information that had been obtained directly as a consequence of Carter's unlawful arrest. (The affidavit was in evidence as Defendant's Exhibit 7.)  The question arises whether, if such information were to be redacted from the affidavit, the remaining substance of the affidavit would have justified the issuance of the search warrant.  I conclude that it would not.

      Appropriate redaction of the affidavit would require excision of the following portions of the affidavit:

      (i)  the penultimate sentence of paragraph 5. This provides the information about the alert to the crates by the drug sniffing dog.  However, the dog's exposure to the crates only occurred because the police had, without probable cause, arrested Carter and seized the crates, which he was in the process of removing.  But  for the illegal arrest of Carter, there would have been no basis for

refusing to permit him to drive away with the crates. It was only because the police had arrested Carter and seized possession of the crates that the investigation using the dog was possible.

(ii) all of paragraphs 6 and 7. These paragraphs detail what Carter told police during their custodial interrogation of him. For the reasons set forth above, his statements to the police are suppressed.

With these redactions, the affidavit simply presents what police knew about the shipment of the crates prior to Carter's arrest. For the same reasons that this limited information did not provide probable cause to arrest Carter at the time, it would not have provided probable cause to issue the warrant when presented to the magistrate judge.

Because the warrant was issued on the basis of unlawfully obtained evidence and could not properly have issued if that evidence were redacted from the affidavit, the evidence seized as a result of the search pursuant to the tainted warrant must also be suppressed, including specifically the contents of the crates.

III.     Conclusion

For all the foregoing reasons, the defendant's motion is GRANTED.     The following categories of evidence may not be used by the government:

(a) Statements made by Carter during his custody;

(b) Evidence from the examination of Carter's cell phone; and

(c) Evidence from the examination of the crates pursuant to the search warrant issued March 3, 2004.

It is SO ORDERED.


February 8, 2006                                              \s\ George A. O'Toole, Jr.

DATE                                    DISTRICT JUDGE